[No. 16657. Department One. April 8, 1922.]

ARTHUR HARPER *et al., Appellants,* v. W. N. HOLSTON
*et al., Respondents.*[1]

PUBLIC LANDS (9)—WATERS AND WATER COURSES (45)—SURVEY—
MEANDER LINES—RIGHT TO BED OF STREAM. Government meander
lines of a stream, marking fractional portions of the public domain,
are run to ascertain the quantity of land in the fractions and not as
boundary lines, and the patentee takes to the thread of an unnavi-
gable stream.

WATERS AND WATER COURSES (46)—BED AND BANKS OF STREAM—
ACCRETION. Where a meandered stream, constituting the boundary
of government fractional subdivisions, gradually shifts its location,
a subsequent patent of the fractional lot conveys title to any accre-
tions.

SAME (46). The shifting of a government meandered stream is
shown to have been gradual, so that the gains were made by accre-
tion, and not by avulsion, where all the witnesses testified that there
were no sudden changes and there is no evidence of abandoned
channels characteristic of avulsions.

EJECTMENT (6)—TITLE TO SUPPORT ACTION. In ejectment, plain-
tiff must recover on the strength of his own title, and not on the
weakness of his adversary's.

Appeal from a judgment of the superior court for
Yakima county, Taylor, J., entered January 10, 1921,
in favor of the defendants, in an action in ejectment,
tried to the court. Reversed.

*Grady & Shumate,* for appellants.

*H. J. Snively,* for respondents.

FULLERTON, J.—This is an action of ejectment,
brought by the appellants Harper against the respond-
ents, Holston and Woodall, to recover possession of a
tract of land described as parts of lots two and three,
in section twenty-eight, in township eleven, north of
range twenty, east of the Willamette Meridian. The

[1]Reported in 205 Pac. 1062.

complaint was in the usual form in such cases. The answer put in issue the allegations of the complaint, and, as an affirmative defense, alleged that the land claimed by the appellants was without the boundary lines of the lots named, and was unsurveyed, unappropriated, and unpatented land belonging to the government of the United States. Further matters were alleged tending to show that the respondents' occupancy of the land was lawful and of right. The trial was had by the court sitting without a jury, and resulted in a judgment in favor of the respondents. To review the judgment, this appeal is prosecuted.

The facts giving rise to the controversy are in substance these: The Yakima river flows through the township of which the land in controversy forms a part, in a general southeasterly direction. This is an unnavigable stream, although it flows a considerable body of water. In extending the interior surveys over the township named, the government treated the river as it usually treats a navigable stream; it caused the parts of the township into which the river divided it to be separately surveyed, projecting the section lines which intersected the stream in the northerly part from north to south and from east to west, and those which intersected it in the southerly part from south to north and from west to east, causing the stream to be meandered on both of its banks. The northerly part of the township was surveyed in 1865, and the southerly part in 1874. The measurements reported by the surveyors show a considerable shifting of the channel of the river between the time of these surveys. Measuring south from the northeast corner of section twenty-eight, the section in which the lands in controversy are situated, the surveyor surveying the northerly part reported that he intersected the north bank of the river at

twenty-three and twenty-seven one hundredths chains, while the surveyor measuring north from the southeast corner of the same section, reported that he intersected the south bank of the river at thirty-seven and fifty one-hundredths chains, which, ignoring the width of the river and assuming that the section was of the usual size, would indicate a shifting of the channel of the river to the south at this point, between the time of the surveys, some twenty chains. The meander lines also indicate such a shifting. Projecting the courses and distances westerly, they gradually approach each other, reaching the approximate width of the river as the west boundary line of the section is reached. Projecting them easterly, the approach of the lines is more rapid, practically coinciding at a point some one-fourth of a mile east of the east line of section twenty-eight. From this point they again diverge, the first of the surveys extending in a general easterly direction, while the second extends to the south and southeast. The evidence also shows that there has been, since the last survey, a further shifting of the main channel of the river. A recent survey made by an engineer who testified at the trial shows that the meander corner set as the south boundary of the river by the surveyor who surveyed the south part of the township was set to the north of the present main channel, and that his meander line, for considerable distances both east and west of the meander corner, is also to the north of the present channel; at one point more than twenty chains to the north.

The recent survey also shows other changes in the channel of the river. Neither of the surveyors making the original surveys reported finding more than one channel, while the recent survey shows three, although two of these practically coincide at the place where

the east line of section twenty-eight crosses the main or southernmost channel. Evidence that the two northerly channels had no existence at the time of the original surveys is also furnished by the field notes of the surveyors making the surveys. The surveyor surveying the north part of the township, in projecting his meander lines, twice crossed places where the north channel now exists, and crossed one place where the center channel now exists, without mention of either, and the surveyor surveying the south part of the township twice crossed places where the middle channel is now found, likewise without noting it in his field notes. That the failure to mention the streams, if they then existed, could have been no mere inadvertence is evidenced by the fact that the field notes of each of the surveyors are replete with references to much less minor objects, some of which are water courses. It may be stated here that there is nothing in the record which challenges the good faith of the surveyors making the surveys, and nothing which indicates that they did not truthfully report the conditions as they found them. There is not much on the surface of the ground, it is true, which indicates that the river was at the places the surveyors found it to be at the times of their respective surveys, although the engineer making the recent survey did say that there was a decided bank at the place where the first surveyor set his meander corner, which bank followed for some distance on each side of the corner the meander line as the engineer retraced it. But assuming there were no indications of a channel, it by no means convicts the surveyors of false or fraudulent surveys. The land through which the river courses at this place is bottom land, composed of soil, sand and gravel, substances not conducive to the maintenance of a fixed channel. Indeed, it seems

to us, it would be more strange if the river there maintained a uniform channel than it is strange that it would shift one way or the other as time elapsed. The evidence of all of the witnesses testifying at the trial is to the effect that there has been a gradual shifting of the main channel of the river to the southward. While none could remember when there was not more than one channel at this place, all agree that the south channel is now, and has always been, the main channel.

The land described in the complaint was entered with other lands as a homestead in 1899. The government patented the land to the entryman in 1891, and the appellants are his successors in interest. The entry and the patent, of course, described the land according to the survey of 1865.

If we have made ourselves understood by the foregoing statement, it is apparent that the surveys made of the different parts of the township do not connect. Stated more particularly, there is between the meander lines of the two surveys an irregular shaped tract of land something more than the width of the river over which the surveys do not extend. It is in this area that the tract in dispute lies. The respondent contends that, because the government surveys do not close over it, it is unsurveyed public land, subject to settlement in its present condition, and subject to entry when the government chooses to extend the surveys over it; while the appellants contend that it is an accretion to the tract patented to their predecessor in title, and is theirs in virtue of their title deeds.

There is no disagreement between counsel as to the applicable principles of law. Meander lines run in surveying fractional portions of the public lands bordering upon streams, whether navigable or unnavigable, are run not as boundaries of the tract, but are run

for the purpose of defining the sinuosities of the banks of the streams, and as a means of ascertaining the quantity of land in the fractions; that the stream itself is the actual boundary in all cases; the part of the stream which forms the boundary differing in the different states according to the local law; that the local law of this state recognizes the line of ordinary high water as the boundary line on all navigable streams, and the thread of the stream as the boundary on all streams that are unnavigable.

Another rule is that, when grants of land border on running water, and the course of the stream is changed by that process known as accretion—that is to say, the gradual washing away on the one side and the gradual building up on the other—the owner's boundary changes with the changing course of the stream. As was said by the supreme court of the United States in *New Orleans v. United States,* 10 Peters (35 U.S.) 662:

"No other rule can be applied, on just principles. Every proprietor whose land is thus bounded, is subject to loss, by the same means which may add to his territory; and as he is without remedy for his loss, in this way, he cannot be held accountable for his gains."

The rule is as much applicable to the government as it is to private individuals. If the government chooses to grant its lands, making a running stream one of the boundaries of the grant, it must expect this part of the boundary to change as time goes on. Ordinarily it gains in one place what it loses in another, and on no principle of justice can it say that it is not to be subjected to the general rule. And such we understand to be the holding of the supreme court in *Jefferis v. East Omaha Land Co.,* 134 U. S. 178. There the boundary was the Missouri river. The patent to the land made to the individual by the government was made some years after the survey, during which time

there had been an accretion to the land by the changing course of the stream. It was held that a patent to the land according to the lot number of the official plat of the survey conveyed to the patentee the title to all accretion which had been formed between the time of the survey and the date of the patent.

On the other hand, it is equally the rule that, when a stream which is a boundary, from any cause, suddenly abandons its old channel and creates a new one, or suddenly washes from one of its banks a considerable body of land and deposits it on the opposite bank, the boundary does not change with changed course of the stream, but remains as it was before. This sudden and rapid change is termed in law an avulsion, and differs from an accretion in that the one is violent and visible, while the other is gradual, and perceptible only after a lapse of time.

It is the rule, also, that the appellants must recover on the strength of their own title, and not on the weakness of their adversary's. And, since the land in controversy is not within the defined boundaries of the conveyances under which they hold, it must appear, if they are to recover, that the disputed land has been added to their original boundaries by accretion. Does the evidence preponderate in favor of this view? It is our conclusion that it does. Some of the salient facts we have hereinbefore set out. In addition, it appears that the river has not, within the memory of the witnesses testifying on the subject, ever been subject to sudden or violent changes. All testify that there has been a drift of the main channel of the river to the south, and all agree that the change has been gradual, not the result of any sudden change. There is, of course, a period between the time of the original surveys and the time when the recollection of the witnesses

begin which is not covered by the evidence, and it is evident, also, that during this period the river formed two additional channels at this place. But we cannot think this argues against the general conclusion that the drift of the main channel has been gradual rather than sudden or avulsive. The record is silent as to evidences of abandoned channels, and these it would seem must certainly exist if the change in the course of the stream had been other than gradual.

It is our conclusion that the land in dispute is a part of the appellant's holding, rather than a part of the unsurveyed public lands of the United States. The judgment is therefore reversed, and the cause remanded with directions to enter a judgment for the appellants, plaintiffs below.

PARKER, C. J., BRIDGES, MITCHELL, and TOLMAN, JJ., concur.