[No. 39328.    Department One.    October 3, 1968.]

C. A. PARKER et al., *Respondents*, v. JOHN V. FARRELL et al., *Appellants.**

*Lycette, Diamond & Sylvester*, by *Richard M. Foreman*, for appellants.

WEAVER, J.—Defendants appeal from a judgment and decree quieting title in plaintiffs to certain real property *now* located on the north side of the Green River, near Auburn, King County, Washington.

Involved is the East one-half of the Southeast one-quarter of Section 17, Township 21 North, Range 5, East of the Willamette Meridian.

We turn first to exhibit 13, which is a plat filed in the Surveyor General's Office, Olympia, W.T., December 20, 1867. It discloses:

(a) The northeast one-quarter of the southeast one-quarter of said section was, on the date of the government survey, composed of (1) Government Lot 11, containing 30 acres and (2) Government Lot 12, containing 4.50 acres. Lot 11 on the north is separated from Lot 12 to the south by the Green River, which is nonnavigable and flows generally from east to west. It is important to bear in mind

*Reported in 445 P.2d 620.

that the survey of 1867 places the Green River in the northeast one-quarter of the southeast one-quarter as the south boundary of Government Lot 11 and the north boundary of Government Lot 12; the river, in 1867, did not invade the southeast one-quarter of the southeast one-quarter of the section, except in the northwest corner thereof.

(b) The southeast one-quarter of the southeast one-quarter, containing 39.75 acres, is designated Government Lot 13. It is, of course, immediately south of Government Lot 12.

Defendants-appellants are the owners of Government Lot 11. Plaintiffs-respondents, who have not appeared in this court, are the contract vendees of Government Lots 12 and 13.

Over the years, the Green River has changed its course. Instead of flowing generally from east to west across the southern portion of the northeast one-quarter of the southeast one-quarter, as disclosed by the 1867 survey, it now swings southwest for some considerable distance and then loops to the northwest. Thus, at present, all of Lot 12 and a substantial portion of Lot 13 are now *north* of the river and not *south* of it as they were in 1867. The disputed property is Lot 12 and that portion of Lot 13 now north of the Green River.

If, as defendants contend, the river has slowly shifted, the boundary between Lots 11 and 12 has changed to the southward as the river shifted; Lot 12 has been wiped out; and the major part of Lot 13 has been lost to its owners.

The law of this jurisdiction, applicable to the facts of this case, has been settled by prior decisions. This court has held that the line of ordinary high water is the boundary of navigable streams and that the thread or channel of a nonnavigable stream is the boundary line between two parcels of real property. When the course of the stream changes, the boundary line may or may not shift with the stream. If the change is slow and imperceptible so that

it may be classified as accretion or reliction,[1] the boundary line shifts. If, however, the change of the stream is avulsive, the original boundary line remains. *Hirt v. Entus,* 37 Wn.2d 418, 224 P.2d 620 (1950); *Harper v. Holston,* 119 Wash. 436, 440, 205 Pac. 1062 (1922).

After an extended trial, the court entered findings of fact 4 and 5 to which defendants assign error:

4. That the former course of the Green River in its main channel flowed between the above described properties of the plaintiffs [Lots 12 and 13] and defendants [Lot 11] and formed the southerly boundary of defendants' property and the northerly boundary of plaintiffs' property. That sometime during the early 1900's, as a result of a log jam, the Green River left its bed in an avulsive movement, taking up a new channel approximately 500 to 700 feet to the south. That thereafter the Green River continued to move slowly to the south each year in an accretive type movement until the present date.

5. That due to the fact that the initial movement of the Green River was rapid in nature and constituted an avulsion, such movement did not change the title or ownership in and to the riparian property of plaintiffs and

---

[1]American Law of Property § 15.26 (A. J. Casner ed.1952) provides the following definitions:

*Accretions* or *accreted lands* are additions to the area of realty from gradual deposit by water of solid material, whether mud, sand, or sediment, producing dry land which before was covered by water, along banks of navigable or unnavigable bodies of water.

*Reliction* is the term applied to land that has been covered by water, but which has been uncovered by the imperceptible recession of the water.

*Accretion as a general term.* Technically speaking, land uncovered by a gradual subsidence of water is not an accretion but a reliction, but the terms are often used interchangeably, and law relating to accretions applies in all its features to relictions.

*Avulsion* is the sudden change of the banks of a stream such as occurs when a river forms a new course by going through a bend, the sudden abandonment by a stream of its old channel and the creation of a new one, or a sudden washing from one of its banks of a considerable quantity of land and its deposit on the opposite bank.

*Erosion* is the gradual and imperceptible wearing away of land (bordering on a body of water) by the natural action of the elements . . . .

defendants, and plaintiffs' title in and to the hereinafter described property should be quieted, free and clear of any claim on the part of the defendants, said property being described as:

That portion of Government Lots 12 and 13, in Section 17, Township 21 North, Range 5 East, W.M. described as follows:

[The north boundary of the metes and bounds description was determined by the 1965 survey of the thread of the Green River in 1867 as it appeared from the terrain.] (See *supra.*)

In the last analysis, after a complete review of the record, this is a factual appeal—is there evidence to support the trial court's finding that the Green River left its bed in an avulsive movement?

Admittedly, the evidence is conflicting, but there is evidence to support the finding of the trial court that, by reason of a log jam, the Green River, sometime after 1867 (when the river flowed across the northeast one-quarter of the southeast one-quarter) suddenly changed its flow from a general westerly direction to a southwesterly and then to a northwesterly direction so that Lot 12 and a goodly portion of Lot 13 were then located north, instead of south, of the river.

The 1867 plat is based upon the field notes of those making the survey. The notes are in evidence. Mr. McKiddy, a registered land surveyor, who surveyed the land for plaintiffs in 1965, testified that:

The north line [of Lot 12] was not too well defined [by the 1867 notes] and it had to be defined for an acreage volume.

. . . .

The survey of 1867 cannot be duplicated exactly because the survey was an incomplete survey on the 1867 meander of Green River and the Government notes so show it.

The 1867 surveyors did not run a meander line along the south bank of the Green River. They did establish a meander line on the north bank. It did not, of course, represent the thread or channel of the old stream.

The metes and bounds description of the north line of Lot 12, as used in plaintiffs' amended complaint and adopted by the court in its judgment, was established by Mr. McKiddy's 1965 survey. He testified:

> The channel that we determined, the old original channel that we determined, is a historic channel. It is quite obvious that it's a historic channel by the very evidence of its being there and the depth of it and the width of it and the vegetation of it.
>
> . . . .
>
> We found a naturally grooved channel that had been caused by erosion of water, which would mean an old river bed.
>
> . . . .
>
> We established the center of it [the old river channel].

■ Having determined that the river changed its course by avulsion, the thread of the historic channel remained the north boundary line of Lot 12. *Hirt v. Entus, supra.*

■ Although the record discloses that the 1867 north meander line of the Green River does not correspond exactly with the 1965 survey of the historic channel of the river, this in nowise detracts from the court's finding. In *Harper v. Holston, supra,* the court said:

> There is no disagreement between counsel as to the applicable principles of law. *Meander lines run in surveying fractional portions of the public lands bordering upon streams, whether navigable or unnavigable, are run not as boundaries of the tract, but are run for the purpose of defining the sinuosities of the banks of the streams, and as a means of ascertaining the quantity of land in the fractions;* that the stream itself is the actual boundary in all cases; the part of the stream which forms the boundary differing in the different states according to the local law; that the local law of this state recognizes the line of ordinary high water as the boundary line on all navigable streams, and the thread of the stream as the boundary on all streams that are unnavigable. (Italics ours.)

558

Since we conclude that the judgment should be affirmed, it is not necessary to discuss defendants' claim that plaintiffs have slandered the title of defendants' land.

Affirmed.

FINLEY, C. J., ROSELLINI and McGOVERN, JJ., and LANGEN-BACH, J. Pro Tem., concur.