**PUYALLUP TRIBE OF INDIANS,**
Plaintiff,

v.

**PORT OF TACOMA, Defendant.**

No. C80–164T.

United States District Court,
W. D. Washington.

July 24, 1981.

67

John Clinbell, Law Office, Puyallup Nation, Tacoma, Wash., for plaintiff.

James J. Mason, Tacoma, Wash., for defendant.

## MEMORANDUM OPINION

TANNER, District Judge.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

### STATEMENT OF THE CASE

This case came on regularly for trial before the above named court on May 4, 1981. Jurisdiction in this case is under 28 U.S.C. 1362. Venue is proper in this court in that the Puyallup river, which is at issue here, runs through the Western District of Washington and empties into Puget Sound at Tacoma, Pierce County, Washington.

The final Pretrial Order was filed on April 27, 1981. Counsel for both parties appeared, oral testimony of witnesses was taken, exhibits were filed, affidavits of other witnesses were filed for consideration by the court. Pretrial briefs, and final arguments were made by both parties. Both parties submitted post-trial briefs. Findings of Facts and Conclusions of Law, before trial and after trial, were submitted for the court's consideration., The cases cited by both parties as possible authority

for any of the issues involved herein were all read and considered by the court.

The court has heard, reviewed, weighed and evaluated all of the evidence in accordance with the applicable Federal Rules of Civil Procedure, Local Rules and the Rules of Evidence.

Although the court did not believe that the United States or the State of Washington were indispensable or necessary parties in this case, the court did invite both to file amicus curiae briefs. The United States did not respond, but the Attorney General of the State of Washington did file a brief. The court has considered that brief.

## SUMMARY OF FINDINGS OF FACT AND CONCLUSIONS OF LAW

The issues in this case, as the court understands them does not involve Indian treaty fishing rights as such. But, the history of the Puyallup Indians as to fishing on the Puyallup River is one of the basic issues before the court.

The parties are before the court seeking an order quieting title to two parcels of real property. The Puyallup Indian Tribe, the Plaintiff herein, and the Port of Tacoma, the Defendant herein, each claim ownership of the two parcels of real property located within the exterior boundaries of the Puyallup Indian Reservation.

The court has read the decisions in *Puyallup I*, 391 U.S. 392, 88 S.Ct. 1725, 20 L.Ed.2d 689, and *Puyallup II*, 414 U.S. 44, 94 S.Ct. 330, 38 L.Ed.2d 254, and *Puyallup III*, 433 U.S. 165, 97 S.Ct. 2616, 53 L.Ed.2d 667. The decisions in those cases are not dispositive of the issues here. Those cases involved state regulations in the interest of conservation as to Indian treaty fishing rights, net fishing for steelhead trout, by Indians, on the Puyallup Reservation, and the issue of whether or not the Puyallup Indians had exclusive rights under federal treaty to take steelhead passing through the Puyallup River within the confines of the Puyallup Reservation.

In *Puyallup III* the Supreme Court of the United States decided that the language used in the 1868 Treaty of Fort Laramie was virtually identical as the language used in Article II of the 1854 Treaty of Medicine Creek, see *Puyallup III* at 174, 97 S.Ct. at 2622.

The court is aware that there is no language in the Treaty of Medicine Creek of 1854 and 1855 or in the Executive Order of January 20, 1857 that definitely declares or otherwise makes plain any intention to convey, nor are there any express conveyances that expressly conveyed or referred to the bed of the Puyallup River. The property involved in this lawsuit was not within the exterior boundaries of the 1280 acre Puyallup Reservation as it was established by the Medicine Creek Treaty. But, the property is within the exterior boundaries as established by the Executive Order of January 20, 1857.

It is with the foregoing in mind that the Court examines and decides the issues in this case.

The question is whether the United States conveyed beneficial ownership of the Puyallup riverbed, within the exterior boundaries of the Puyallup Reservation, to the Puyallup Indians by the Treaties of 1854–1855 and the Executive Order of January 20, 1857, and therefore continues to hold the land in trust for the use and benefit of the tribe, or whether the United States retained ownership of the riverbed as public land which then passed to the State of Washington upon its admission to the Union. *Montana v. U.S.*, —— U.S. ——, 101 S.Ct. 1245, 67 L.Ed.2d 493 and *Choctaw Nation v. Oklahoma*, 397 U.S. 620, 627–628, 90 S.Ct. 1328, 1332–33, 25 L.Ed.2d 615.

As a general principle the federal government holds lands under navigable waters in trust for future states, to grant to such states when they enter the Union. There is a strong presumption against conveyance of such lands by the United States. *Montana v. U.S., supra; U.S. v. Oregon*, 295 U.S. 1 at 14, 55 S.Ct. 610 at 615, 79 L.Ed. 1267.

This court cannot infer such a conveyance "unless the intention was definitely declared or otherwise made plain". *U.S. v. Holt State Bank*, 270 U.S. 49, at 55, 46 S.Ct. 197, at 199, 70 L.Ed. 465; *Montana v. U.S., supra.*

It has been determined, however, that congress may sometimes convey lands below the high water mark of a navigable water. *Shively v. Bowlby*, 152 U.S. 1, 14 S.Ct. 548, 38 L.Ed. 331; *Montana v. U.S., supra.*

Whether a grant or reservation included the bed of a navigable river depends upon whether there was demonstrated an intention to do so. That intent is to be determined from the documents which created the reservation and from other available documents and surrounding circumstances which reflect the intention of the parties. *Montana v. U.S., supra; Alaska Pacific Fisheries v. U.S.*, 248 U.S. 78, 87, 39 S.Ct. 40, 41, 63 L.Ed. 138.

In order to find that a riverbed was included within a reservation there must have been a public exigency to justify a departure from the normal rule. The Supreme Court has defined "public exigency" to include three kinds of situations. They are as follows: (1) performance of international obligations; (2) improvement of commerce, or (3) "carrying out other public purposes appropriate to the objects for which the territory was held". *U.S. v. Holt State Bank, supra; Shively v. Bowlby, supra.*

The establishment of an Indian Tribe can be an "appropriate public purpose" within the meaning of *Shively v. Bowlby*, justifying a congressional conveyance of a riverbed.

The Puyallup Tribe of Indians is duly recognized by the United States Secretary of Interior. The Tribe is located on the Puyallup Indian Reservation in the Western District of Washington. Members of the Tribe are descended from Puyallup Indians who were parties to the Treaty of Medicine Creek 1854–1855 and the Executive Order of January 20, 1857.

The importance of fishing to the diet and way of life of an Indian Tribe is among the circumstances which can demonstrate the required "public exigency" sufficient to support a finding that the bed of a river was included within an Indian reservation. *Montana v. U.S., supra; Alaska Pacific Fisheries v. U.S., supra.*

This court has reviewed, weighed and evaluated all of the evidence presented herein by both parties, and the court is persuaded by the most credible evidence that at the time of the Treaty of Medicine Creek, 1854–1855, and the Executive Order of January 20, 1857, the Puyallup Indians depended primarily upon fishing for their diet, and as a primary item of trade with other Indians as well as later with non-Indians. The evidence also shows that the Puyallup Indians had occupied the area around the Puyallup River, Commencement Bay and the surrounding areas of southern Puget Sound since time immemorial.

The court is convinced by a preponderance of the evidence adduced herein, that the Puyallup Indians centered their lines in and around the Puyallup River. Their primary diet, their spiritual, religious, political, and social life came from the river.

The court is also persuaded by a preponderance of the evidence that the establishment of the Puyallup Indian Tribe was an "appropriate public purpose" justifying a congressional conveyance of a riverbed.

The expansion of the Puyallup Reservation by the Executive Order of January 20, 1857 to include that area of the Puyallup River now at issue here was a "public exigency". The evidence is substantial, and actually uncontradicted by any credible evidence that there was an urgent and immediate need which the United States felt to meet the needs and desires of the Indians so as to end the war which was then taking place.

The land at issue here is not included within the 22 acres remaining on the reservation. The alienation of land by those certain members of the Puyallup Tribe did not transfer title to any part of the Puyallup River.

Grants of land adjacent to a navigable river generally, as a matter of law, do not include the bed of the river. *Montana v. U.S., supra.* That general rule, the intent of the parties described in the Findings of Fact, and the stipulation of Defendant's counsel on this issue, all demonstrate that the bed of the Puyallup River was not included in the assignment of parcels of land to those certain Puyallup Indians made under the allotment program in 1886.

Pursuant to two acts of congress, 27 Stat. 633, and c. 1816, 33 Stat. 565, certain members of the Puyallup Tribe alienated, in fee simple absolute, all but 22 acres of their 18,000 acre reservation. None of the 22 acres abuts on the Puyallup River. *Puyallup Tribe v. Dept. of Game State of Washington,* 433 U.S. 165, 97 S.Ct. 2616, 53 L.Ed.2d 667.

Relying on *Mattz v. Arnett,* 412 U.S. 481, 93 S.Ct. 2245, 37 L.Ed.2d 92, the Court of Appeal, Ninth Circuit, held "that the Puyallup Indian Reservation continues to exist", *U.S. v. State of Washington,* 496 F.2d 620 (9th Cir. 1974).

The facts in this case show that by a preponderance of the evidence that the Puyallup River was at all times pertinent herein, and is still today a navigable river.

It is the opinion of this court that the preponderance of the evidence shows that the facts and circumstances herein are substantial and persuasive, that the United States intended, and did include, the underlying bed of the Puyallup River as part of the Puyallup Indian Reservation.

The effect of movement of a river channel on ownership of property in the vicinity of a river is to be determined by federal law. However, federal law will look to the law of the state in which the case arises for the legal standards.

Under Washington law, changes in river channels, as applied to this case, involve certain accretive changes and avulsive changes.

Under Washington law, when the bank of a navigable river forms the boundary between property owners, that boundary changes with accretive changes in the river channel. *Harper v. Holston,* 119 Wash. 436, 441, 205 P. 1062, 1064; *Smith Tug & Barge Co. v. Columbia Pacific Towing Corp.,* 78 Wash.2d 975, 482 P.2d 769, 771.

Any portion of the property which may have been outside of the river channel when part of the Puyallup Reservation was allotted in 1886 was added to the riverbed by a series of accretive changes between 1886 and the later 1940's and was, therefore, added to the Tribe's ownership of the bed. *Ghione v. Washington,* 26 Wash.2d 635, 644, 175 P.2d 955, 962.

Movement of the Puyallup river by the Army Corps of Engineers, as described in the findings herein, constitutes an avulsive change under Washington law. *Harper v. Holston, supra; Ghione v. Washington, supra; Rose v. Riedinger,* 13 Wash.App. 222, 534 P.2d 146; *Parker v. Farrell,* 74 Wash.2d 553, 445 P.2d 620.

When artificial relocation of a river channel leaves portions of the former channel abandoned as dry land, the owner of the river bed retains ownership of the abandoned channel under Washington law. The owner of the adjacent property to the abandoned channel does not receive title. *Hill v. Newell,* 86 Wash. 227, 149 P. 951; *Commercial Waterway District v. Washington,* 50 Wash.2d 335, 311 P.2d 680; *Ghione v. Washington, supra.*

The court now makes Findings of Facts and Conclusions of Law. They are based upon a preponderance of the evidence that the court has found most credible and all reasonable inferences drawn therefrom.

## FINDINGS OF FACT

1. Jurisdiction in this case is under 28 U.S.C. 1362. Venue is proper in that the Puyallup River at issue here, runs through the Western District of Washington and empties into Puget Sound at Tacoma, Pierce County, Washington.

2. The Puyallup Tribe of Indians is an Indian Tribe with a governing body duly recognized by the United States Secretary of the Interior. The Tribe is located on the

Puyallup Indian Reservation in the western part of Washington. Members of the Tribe are descended from Puyallup Indians who were parties to the Treaty of Medicine Creek (10 Stat. 1132, December 26, 1854). PTO ¶ 1; testimony of Dr. Barbara Lane.

3. The Port of Tacoma is a municipal corporation under the laws of Washington. It is neither an Indian Tribe nor an Indian person. PTO ¶ 2.

4. The Puyallup Tribe and the Port of Tacoma each claim ownership of certain real property designated parcels 133 and 134, more particularly described in Admitted Fact No. 3 in the Pretrial Order. The Port has no deed or other document reflecting ownership of the property and does not base its claim on any documentary chain of title. (The term "the property" shall be used in these findings of fact and conclusions of law to refer to the above real property.) PTO ¶'s 3, 45; Exhs. 31, D–1.

5. Puyallup Indians have occupied the area around the Puyallup River, Commencement Bay, and surrounding areas of southern Puget Sound since time immemorial. Before and at treaty times, Puyallup Indians lived in a number of villages throughout the Puyallup watershed and in the surrounding area. Each village in the Puyallup River watershed was located on the banks of the Puyallup River, one of its tributaries, or on saltwater. The villages were permanent, year-round places of residence which were located as they were because of the importance of the Puyallup River and its tributaries to the Indians. Although each village was a separate unit, the villages were united by their identification with the Puyallup River watershed, as described below. Although some members would leave their villages to hunt and fish for short periods, they then returned to their own villages. Each village obtained the major portion of its food and other necessities from its surrounding area within the Puyallup drainage system. The main Puyallup village was located in the vicinity of the property. PTO ¶ 6; Exhs. 24, 30; testimony of Dr. Lane.

6. For Puyallup Indians, the fresh water courses of the area were the center of their world and their lives. Puyallup people identified themselves by the name of their village, which was in turn derived from the name of the water course on which the village was located. The Indians conceived of geographical boundaries not as a line around a certain area but as a waterway plus the land that surrounded it. Thus, Puyallup Indians conceived of their territory as the Puyallup River and the surrounding land. Their equivalent of political unity or allegiance was their sense of affinity with other villages and people in the Puyallup River drainage system. The Puyallups' spiritual, religious and social life centered around the river. Further the Indians identified directions by reference to the major water courses, using such terms as up-sound, down-sound, up-stream, and down-stream. PTO ¶ 7; Exh. 24; testimony of Dr. Lane.

7. Fishing for salmon and steelhead has always been central to the way of life of Puyallup Indians. Fish were the central item of their diet, a primary item of trade with other Indians and later with non-Indians, and central to one of their most important religious ceremonies. Puyallup Indians have maintained that focus and dependence on fishing in accordance with their traditional ways and treaty-reserved rights. The Puyallup River has always been, and is today, the central and most important fishing area for the Tribe, and has been determined by the federal courts to be among the Tribe's usual and accustomed fishing grounds and stations as that term is used in Article 3 of the Treaty of Medicine Creek. Among the methods they used for harvesting fish in the river were weirs and traps, substantial structures which spanned the width of the river with a series of wooden tripods which were firmly implanted in the bed of the river. Although they were removed or washed out during high water, they were replaced for each fishing season. PTO ¶'s 8, 9; Exhs. 3, 24, 30, 48, 49, 50; testimony of Dr. Lane.

8. Small boats have always used the lower portion of the Puyallup River includ-

ing that portion of the river in the vicinity of the property. Puyallup Indians navigated the river with their fishing boats and canoes. The Indians designed canoes especially suited to traversing the perils of the river. The canoes would often be poled rather than paddled to traverse difficult stretches. The Puyallup River was, before channelization, and is today navigable in fact. PTO ¶ 43; testimony of Dr. Lane; testimony of Whitnew M. Borland; testimony of Frank G. Wright.

9. The United States sought treaties with the Indians in the Pacific Northwest in order to clear title to the land to allow settlement by non-Indians. Puyallup Indians and the United States signed the Treaty of Medicine Creek on December 26, 1854; the Treaty was ratified by the United States Congress on March 3, 1855. Among other provisions, the Indians ceded a large area of land to the United States but retained a small reservation "for their exclusive use ..." The reservation set aside by the Treaty was a rocky forested section on the south side of Commencement Bay. PTO ¶'s 4, 5, 16, 17; Exhs. 1, 2; testimony of Dr. Lane.

10. The United States representatives at the treaty council, including Territorial Governor Isaac Stevens, who was responsible for negotiating the treaties, were very familiar with the importance of fishing to the Indians. Stevens' subsequent report on the Treaty to the Commissioner of Indian Affairs demonstrates his emphasis on the need to allow the Indians to continue to fish and his intent to locate the reservations to meet the Indians' needs and desires. PTO ¶ 19; Exh. 2; testimony of Dr. Lane.

11. Soon after the Treaty was signed, fighting broke out between Indians and non-Indians in the area, resulting in the deaths of many non-Indian settlers. Among the causes of those hostilities was the inadequacy of the area set aside as the Puyallup Reservation. One of the shortcomings of the Reservation was that it did not include the Tribe's traditional fishing areas and villages along the Puyallup River. PTO ¶ 17; testimony of Dr. Lane.

12. The United States sought to end those hostilities and gain peace by convening the Fox Island Council. The United States representatives expressed their awareness that the cause of the hostilities was the inadequacy of the Puyallup Reservation. Governor Stevens reminded the Indians that he had promised to modify the treaty reservations if they were unsuitable. He asked the Indians to make known their needs and desires; he stressed that the reservation would be changed so as to conform to their wishes. PTO ¶'s 18, 20; Exh. 3; testimony of Dr. Lane.

13. Stevens recognized and emphasized the importance of the Puyallup River when he spoke of the location of the expanded reservation.

> You shall have a large Res. at Nisqually, one large Res. on the Puyaloop [sic] .... Now my children do you want a Res. on the Nisqually and one on the Puyaloop [sic], I will send word to the Great Father if you want Res. at those places.

The Indians at the Council also stressed the importance of the river, with such statements as:

> I know that my people all want to live on the Puyallup [Stanop-se, a Puyallup]

and

> I am glad my people are going to have a Res. on the Puyallup. That is my home. [Old Simon, a Puyallup]

PTO ¶ 20; Exh. 3, testimony of Dr. Lane.

14. The parties at the Fox Island Council thus agreed to expand the Puyallup Reservation to include the lower portion of the Puyallup River. The Commissioner of Indian Affairs and Secretary of the Interior recommended that the agreement be adopted. President Pierce approved those recommendations in an Executive Order of January 20, 1857. Those recommendations show that the reservation was expanded pursuant to Article 1 of the Treaty of Medicine Creek. The expanded reservation included the property involved in this case. PTO ¶'s 18, 21, 24; Exhs. 3, 4; testimony of Dr. Lane.

15. Governor Stevens' report on the Treaty, the discussions at the Fox Island Council, the United States' officials' awareness of the importance of the river to the Indians for their diet and entire way of life and their extensive use of the river and its bed, and later confirmation by federal officials, all demonstrate the intention and understanding that the Puyallup River and its bed were included as part of the reservation, and the intention to secure to the Puyallup Indians their traditional communal ownership and control of the lands and waters within the exterior boundaries of the reservation. PTO ¶'s 18–24; Exhs. 1–4, 47; testimony of Dr. Lane.

16. The hostilities which resulted from the inadequacy of the treaty reservation and which killed a number of non-Indian settlers were viewed by the United States as a serious, emergency situation, which needed an immediate response and solution. Government officials demonstrated a desire to do whatever was necessary to satisfy the Indians so as to end the fighting. Exhs. 3, 4; testimony of Dr. Lane.

17. The President of the United States assigned parcels of land within the reservation to individual Puyallup Indians in 1886. That was done pursuant to Article 6 of the Treaty of Medicine Creek, which provided for the possibility of allotment so that the Indians "would locate on the [land] as a permanent home..." PTO ¶ 27; testimony of Dr. Lane. There is nothing to indicate that either the United States or the Tribe intended to include the bed in any allotments, and several factors indicating an intent to exclude it. There is nothing to indicate that the allotments changed the Tribe's traditional concept of considering the waterways and their beds as communal property. Members of the Tribe continued to use the river and its bed whether or not they had allotments bordering the river. PTO ¶'s 28, 29, 47; Exhs. 1, 5–11, 14, 19, 20, 43.

18. Prior to the Army Corps of Engineers channelization project in the late 1940's the lower portion of the Puyallup River flowed through marshy lowlands in a winding series of S curves. The river has always carried a large amount of silt, sand, gravel, logs, and other sediment and debris. The river in the past deposited that material further downstream on the bed and along its banks. PTO ¶'s 31, 32; testimony of Whitney M. Borland; Exhs. 13, 21–23.

19. Changes which took place in the river channel in the vicinity of the property prior to channelization were typical of rivers with the characteristics of the Puyallup River. That portion of the river was subject to a continuous process of erosion and soil deposit. That process consisted of erosion of one bank of the river, typically on the outside of a bend in the river, caused by the current of the river and debris carried by the river. At the same time, and typically on the bank opposite the place where erosion was occurring, sediment being carried by the river was deposited, extending that bank into the previous channel. Although the volume of sediment deposited and the rate of erosion varied depending on river conditions, the process in the lower portion of the river was a very gradual one which changed the banks of the river channel gradually over a period of years. PTO ¶ 33; testimony of Whitney M. Borland; Exhs. 13, 21–23.

20. The channel of the Puyallup River in the vicinity of the property gradually but continuously modified its banks and shifted its course between 1874 and the late 1940's. That change was caused by the process described in Finding 19. The river never abandoned its channel, and the total distance which the channel in the vicinity of the property moved during that period of approximately 70 years was less than the width of the channel. There is no evidence of any sudden movement by the river or abandonment of its channel in the vicinity of the property prior to the late 1940's. PTO ¶ 34; Exhs. 13, 21–23, 36–42; testimony of Whitney M. Borland.

21. The Army Corps of Engineers channelization project in the late 1940's removed the river from its channel in the vicinity of the property and relocated it in the artificially constructed channel, leaving the prop-

erty exposed as upland on the bank of the river. Property not involved in this case was taken from the Puyallup Tribe in the condemnation action which provided land for the rechannelization project. PTO ¶ 38; Exhs. 34, 35, 46; testimony of Whitney M. Borland.

22. The river channel, in the vicinity of the property, is today in the same location as it was immediately after the channelization project. The property is not riparian to the Puyallup River. PTO ¶ 38; Exhs. 34, 35; testimony of Whitney M. Borland; testimony of William F. Kittrell.

23. As part of the channelization project, the Corps of Engineers obtained permits from the Bureau of Indian Affairs to deposit dredge spoils on the property. The Bureau was considered the appropriate agency because the property was described as Puyallup Indian Land. PTO ¶ 39; Exhs. 26, 28.

24. The maps labeled Exhibits 34–42 accurately reflect, as well as can be determined, the channel of the Puyallup River in the vicinity of the property at the times indicated on the respective maps. There are other maps of the river available, but none shed any additional light on the position of the river in the vicinity of the property. PTO ¶ 40; Exhs. 34–42; testimony of Whitney M. Borland.

25. The State of Washington was admitted to the United States in 1889. PTO ¶ 44.

26. All uncontested facts contained in the Pretrial Order, but not specifically stated in these Findings are incorporated herein by reference.

FROM THE FOREGOING, THE COURT MAKES THE FOLLOWING

CONCLUSIONS OF LAW

■ 1. The Court has jurisdiction over this case under 28 U.S.C. 1362, in that this is an action brought by an Indian tribe with a governing body duly recognized by the Secretary of the Interior, and presents a question arising under the treaties, Constitution, or laws of the United States. The Puyallup River at issue here, runs through the Western District of Washington.

2. The Puyallup Tribe and the Port of Tacoma each claim ownership of certain real property described as follows:

PARCEL 133

A parcel of land in Section 3, Township 20 North, Range 3 East, Willamette Meridian, Pierce County, Washington, being:

That part of the Puyallup River channel as it existed immediately prior to the channelization of that portion of the river by the United States Army Corps of Engineers, adjacent to government Lots 3, 4 and 9 in said Section 3, bounded on the northeast by the former right bank of said river at the former line of ordinary highwater, and on the southwest and southeast by the Puyallup River Flood Control Project boundary;

Particularly described as, commencing at the center of said Section 3:

S. 89° 51′ 17″ W., 750.93′
S. 42° 23′ 14″ E., approximately 711.50 feet, to the former line of ordinary highwater of the Puyallup River the true point of beginning;
From the true point of beginning,
S. 42° 23′ 14″ E., approximately 1945 feet to a point of curve to the left in a northerly direction from whence the axis bears N. 43° 47′ 11″ W., 523.69 feet;
Along said curve approximately 360 feet to the former line of ordinary highwater.
Along the former line of ordinary highwater in a northwesterly direction to the true point of beginning
Containing 9.39 acres more or less.

and

PARCEL 134

A parcel of land in the former Puyallup River channel as it existed immediately prior to the channelization of that portion of the river by the United States Army Corps of Engineers, adjacent to Lot 10, Section 3, Township 20 North, Range 3 East, Willamette Meridian, Pierce County, Washington, lying between the former line of ordinary highwater on the former right bank of said river and the Puyallup River Flood Control boundary line described as:

Commencing at the southeast corner of said Section 3; thence N. 89° 42′ 32″ W., 940.04 feet; thence N. 42° 23′ 14″ W., 238.60 feet to the point of beginning: From the initial point, N. 42° 23′ 14″ W., 618.53 feet on a curve to the left from a radius which vears N. 46° 10′ 03″ W., 623.69 feet, to the former line of ordinary highwater of the former right bank of said river, Upstream along said former highwater line to the point of beginning. Containing 3.090 acres.

■ 3. Indian Tribes have the right to file suit independently of the United States, where the United States holds the land in trust, and the Indian Tribe is the beneficial owner of the property. *Poafpybitty v. Skelly Oil Co.*, 390 U.S. 365, 88 S.Ct. 982, 19 L.Ed.2d 1238; *Capitan Grande Band of Mission Indians v. Helix Irrigation District*, 514 F.2d 465 (9th Cir.), *cert. denied.*

■ 4. The Plaintiff Puyallup Tribe is the political successor in interest to the Puyallup Indians who signed the Treaty of Medicine Creek (10 Stat. 1132, December 26, 1854). *United States v. Washington*, 384 F.Supp. 312, 370 (W.D.Wash.1974), *aff'd sub nom. Washington v. Fishing Vessel Ass'n.*, 443 U.S. 658, 99 S.Ct. 3055, 61 L.Ed.2d 823 (1979).

■ 5. As a general principle, the Federal Government holds lands under navigable waters in trust for future states, to grant to such states when they enter the Union, and there is a strong presumption against conveyance of such lands by the United States. *Montana v. U. S.*, 450 U.S. at 551–558, 101 S.Ct. at 1251–54, 67 L.Ed.2d at 502–505, *United States v. Oregon*, 295 U.S. at 14, 55 S.Ct. at 615.

■ 6. This court cannot infer such a conveyance "unless the intention was definitely declared or otherwise made plain". *United States v. Holt State Bank*, 270 U.S. 49, at 55, 46 S.Ct. 197, at 199, 70 L.Ed. 465. *Montana v. U. S., supra.*

It is established, however, that congress may sometimes convey lands below the high water mark of a navigable water. *Shively v. Bowlby*, 152 U.S. 1, 48, 14 S.Ct. 548, 566, 38 L.Ed. 331; *Montana v. U.S., supra.*

■ 7. But, because control over the property underlying navigable waters is so strongly identified with the sovereign power of government, *United States v. Oregon, supra*, it will not be held that the United States has conveyed such land "except because of some special duty or exigency". *United States v. Holt*, 270 U.S. 49, 46 S.Ct. 197, 70 L.Ed. 465 *supra.*

■ 8. Whether a grant or reservation included the bed of a navigable river depends on whether there was demonstrated an intention to do so. That intent is to be determined from the documents which created the reservation and from other available documents and surrounding circumstances which reflect the intention of the parties. *Montana v. United States, supra; Alaska Pacific Fisheries v. United States*, 248 U.S. 78, 87, 39 S.Ct. 40, 41, 63 L.Ed. 138 (1918).

■ 9. In order to find that a riverbed was included within a reservation, there must have been a public exigency to justify a departure from the normal rule. The Supreme Court has defined "public exigency" to include three kinds of situations: (1) performance of international obligations; (2) improvement of commerce; or (3) "carrying out other public purposes appropriate to the objects for which the territory was held . . ." *United States v. Holt State Bank, supra; Shively v. Bowlby, supra.*

■ 10. The establishment of an Indian Tribe can be an "appropriate public purpose" within the meaning of *Shively v. Bowlby supra*, 152 U.S. at 48, 14 S.Ct. at 566, justifying a congressional conveyance of a riverbed, see e. g., *Alaska Pacific Fisheries v. United States, supra; Montana v. U. S., supra.*

■ 11. The importance of fishing to the diet or way of life of an Indian Tribe is among the circumstances which can demonstrate the required "public exigency" sufficient to support a finding that the bed of a river was included within an Indian Reservation. *Montana v. United States, supra;*

*Alaska Pacific Fisheries v. United States, supra.* The vital importance of the Puyallup River to the Indians for fishing as well as a variety of other reasons, as described in Findings 4, 5, 6, 7, 9, 10, and 14, above, qualifies as a public exigency as defined by the Supreme Court.

12. Expansion of the Puyallup Reservation in 1857 to include the Puyallup River was a public exigency also because of the urgent and immediate need which the United States felt to meet the desires and needs of the Indians so as to end the war which was then taking place.

13. The bed of a navigable river will be deemed included in a grant or reservation only if the intention to do so was definitely declared or otherwise made plain or was rendered in clear and special words. *Montana v. United States, supra.*

14. The intention to include the Puyallup River as part of the reservation was definitely declared by Governor Stevens and by the Indians, as described in findings 10, 11, 12, 13, and 14, above.

15. Whether or not a body of water is navigable is to be determined by federal law. *Brewer-Elliott Oil & Gas Co. v. United States,* 260 U.S. 77, 87, 43 S.Ct. 60, 64, 67 L.Ed. 140, a river is navigable in law if navigable in fact. *The Daniel Ball,* 10 Wall. 557, 563, 77 U.S. 557, 563, 19 L.Ed. 999. Since the Puyallup River was navigable in fact at the times germane to this case, as shown by the Findings of Fact and the agreement of the parties, it was navigable as a matter of law.

16. Grants of land adjacent to a navigable river generally, as a matter of law, do not include the bed of the river. *Montana v. United States, supra.* That general rule, the intent of the parties described in the findings of fact, and the stipulation of Defendant's counsel on this issue all demonstrate that the bed of the Puyallup River was not included in the assignment of parcels of land to the Puyallup Indians made under the allotment program in 1886.

17. Pursuant to two acts of congress, 27 Stat 633, and c. 1816, 33 Stat 565, the Puyallups alienated, in fee simple absolute, all but 22 acres of their 18,000 acre reservation. None of the 22 acres abuts on the Puyallup River. *Puyallup Tribe v. Dept. of Game State of Washington,* 433 U.S. 165, 97 S.Ct. 2616, 53 L.Ed.2d 667 (1977). The land at issue here is not included within the 22 acres remaining on the reservation. The alienation of land by the Puyallup Indians did not transfer title to any part of the Puyallup River.

18. Relying on *Mattz v. Arnett,* 412 U.S. 481, 93 S.Ct. 2245, 37 L.Ed.2d 92 (1973), the Court of Appeals for the Ninth Circuit held "that the Puyallup Indian Reservation continues to exist". *U. S. v. Washington,* 496 F.2d 620.

19. The effect of movement of a river channel on ownership of property in the vicinity of the river is to be determined by federal law. Federal law will look, however, to the law of the state in which the case arises for the substantial legal standards. *Wilson v. Omaha Indian Tribe,* 442 U.S. 653 at 659–676, 99 S.Ct. 2529 at 2533–42, 61 L.Ed.2d 153.

20. The changes in the river channel, and the process by which those changes took place, described in Finding of Fact 18, above, constitute accretive changes under Washington law. *Harper v. Holston,* 119 Wash. 436, 441, 205 P. 1062, 1064 (1922); *Smith Tug & Barge v. Columbia Pacific Towing Corp.,* 78 Wash.2d 975, 977, 482 P.2d 769, 771 (1971), *cert. denied,* 404 U.S. 829, 92 S.Ct. 67, 30 L.Ed.2d 58 (1971); *Heikkinen v. Hansen,* 57 Wash.2d 840, 843, 360 P.2d 147 (1961).

21. Under Washington law, when the bank of a navigable river forms the boundary between property owners, that boundary changes with accretive changes in the river channel. *Harper v. Holston, supra; Ghione v. Washington,* 26 Wash.2d 635, 644, 175 P.2d 955, 962 (1946).

22. Any portion of the property which may have been outside of the river

channel when part of the reservation was allotted in 1886 was added to the riverbed by a series of accretive changes between 1886 and the late 1940's and therefore was added to the Tribe's ownership of the bed. *Ghione v. Washington, supra.*

23. Movement of the river channel by the Army Corps of Engineers, described in finding 17 above, constitutes an avulsive change under Washington law. *Harper v. Holston, supra; Ghione v. Washington, supra; Rose v. Riedinger,* 13 Wash.App. 222, 534 P.2d 146 (Wn.Ct.App.1975); *Parker v. Farrell,* 74 Wash.2d 553, 445 P.2d 620 (1968).

24. Under Washington law, when the bank of a river forms the boundary between two property owners, an avulsive change in the river channel does not affect the boundary. *Harper v. Holston, supra; Parker v. Farrell, supra.*

25. When artificial relocation of a river channel leaves portions of the former channel abandoned as dry land, the owner of the river bed retains ownership of the abandoned channel under Washington law. The owner of property adjacent to the abandoned channel does not receive title. *Hill v. Newell,* 86 Wash. 227, 149 P. 951 (1915); *Commercial Waterway District v. Washington,* 50 Wash.2d 335, 311 P.2d 680 (1957); *Ghione v. Washington, supra.*

26. The United States did convey the beneficial ownership of the Puyallup riverbed, within the boundaries of the Puyallup Reservation, to the Puyallup Indians by the Treaties of 1854–1855 and the Executive Order of January 27, 1857.

27. The United States continues to hold the property at issue herein in trust for the use and benefit of the Puyallup Tribe.

28. Title to the bed of the Puyallup river, within the exterior boundaries of the Puyallup Reservation, did not pass to the State of Washington when it became a State of the Union in 1889.

29. Plaintiffs petition for Declaratory Judgment Quieting Title to the bed of the Puyallup River as to those parcels of real property herein described, is GRANTED.