[No. 1117-2.    Division Two.    November 14, 1974.]

BERT STROM et al., *Appellants*, v. DICK SHELDON et al., *Respondents*.

*Gerry A. Reitsch* and *Klingberg, Houston, Reitsch, Cross & Frey,* for appellants.

*James B. Finlay,* for respondents.

PEARSON, C.J.—This is an appeal from an order quieting title to a strip of land in the defendants, and from the refusal of the trial court to enjoin defendants from interfering with plaintiffs' use of a slough.

The deeds to both plaintiffs' and defendants' property describe their mutual boundary as being the center, or thread, of a small stream known as "Whiskey Slough." The slough empties into Willapa Harbor. In 1954 the father and predecessor in title of the defendant husband dredged the slough in order to widen it. As a result of the dredging, a significant portion of the stream shifted onto his (now the defendants') property. The defendants used the enlarged slough to moor barges and trollers.

When the plaintiffs purchased their property in 1958, they were unaware that the dredging had placed the original boundary on dry land. In fact, from the record it appears that for many years plaintiffs' predecessor, as well as the defendants' predecessor and the defendants themselves, were not concerned about any change in the centerline of the slough. Upon being requested by the plaintiffs, the defendants would move any craft which obstructed plaintiffs' side of the slough.

In 1972, however, the defendants asserted their claim to the entire slough, and refused to move the barges from plaintiffs' half. They also had a survey taken.[1] Plaintiffs thereupon instituted this action to quiet title to the portion of land running from the original boundary to the present thread. The plaintiffs also asked for an order enjoining the

---

[1]The record does not indicate why defendants asserted their claim in 1972, but the survey was taken shortly after the claim was made.

defendants from interfering with the plaintiffs' use of their half of the slough.

The trial court refused to quiet title in the plaintiffs and refused to issue the injunction. Instead, it quieted title in the defendants by placing the boundary between the parcels in its original location, the thread of the stream prior to 1954. The court applied the "avulsion" rule in reaching its decision, and in so doing, deprived the plaintiffs of access along approximately 300 feet of the slough.[2] The plaintiffs appeal.

The question on this appeal is whether an owner of a parcel which extends to the thread of a nonnavigable stream may by artificial means shift the course of that stream onto his property and thereafter claim the protection of the avulsion rule, so that the adjacent riparian owner is deprived of access to the watercourse. This is apparently a novel question, at least insofar as it concerns a dispute between private parties over a nonnavigable watercourse.

We hold that the avulsion rule is not applicable to the facts presented here, and while this is not technically an accretion or reliction, the result will be the same as if it were. Therefore, the boundary line between the plaintiffs' and the defendants' properties is the thread of Whiskey Slough as presently situated.

■ The importance which the law attaches to riparian ownership can hardly be overstated. Courts have long recognized that access to water is part of the consideration for the deed, and it may well be the most valuable feature of the property. *See, e.g., Hudson House, Inc. v. Rozman,* 82 Wn.2d 178, 509 P.2d 992 (1973); *State v. Sturtevant,* 76 Wash. 158, 135 P. 1035 (1913); *Hughes v. Washington,* 389 U.S. 290, 19 L. Ed. 2d 530, 88 S. Ct. 438 (1967). "The law zealously guards the right of a riparian owner to have access to the stream upon which his land is situated; . . . ." *Gillihan v. Cieloha,* 74 Ore. 462, 467, 145 P. 1061,

---

[2]The plaintiffs did not argue their case on the theory of adverse possession at either the trial level or on appeal.

1062 (1915). Among the rights of riparian ownership is the right to have the water flow in its natural course, and that course may not be diverted by upper and lower riparian owners. *Sund v. Keating,* 43 Wn.2d 36, 259 P.2d 1113 (1953).

The fact that riverbank, lake, and tidewater boundaries rarely remain static for an extended period of time has produced a body of law which seeks on the one hand to preserve the interests of riparian ownership, and on the other hand to maintain some stability in established boundaries. Thus, as a general proposition, when there is a gradual and imperceptible deposit of sediment along the shore (an accretion) the upland owner acquires title to the newly formed land, to the detriment of the owner of the bed. The boundaries may likewise be adjusted when dry land is exposed by a gradual recession of the water (a reliction). But when there is an avulsion—a sudden change in the course of the stream—boundaries are unaffected. *Parker v. Farrell,* 74 Wn.2d 553, 445 P.2d 620 (1968); *Hirt v. Entus,* 37 Wn.2d 418, 224 P.2d 620 (1950); *Harper v. Holston,* 119 Wash. 436, 205 P. 1062 (1922); 3 *American Law of Property* §§ 15.26-.27 (A.J. Casner ed. 1952). Courts frequently do not distinguish between natural and artificial causes; rather, the criterion is the speed of the change. Note, Lundquist, *Artificial Additions to Riparian Land: Extending the Doctrine of Accretion,* 14 Ariz. L. Rev. 315, 327 (1972).

These rules may perhaps best be explained by saying that the accretion-reliction doctrines preserve riparian interests and usually do not significantly harm other property interests, while the avulsion doctrine encourages boundary stability by maintaining the status quo in the face of the frequently wild fluctuation of watercourses undergoing a nature-induced avulsive change.

It has also been suggested that in applying these doctrines as rules of construction, it should be presumed that the parties fixing the boundaries with reference to the water "had in mind the probability of its gradual change with the passage of years, but did not have in mind the

possibility of a sudden and perceptible change." 4 B. Jones, *Tiffany, Real Property* § 1222, at 623 (3d ed. 1939).[3]

The defendants argue that since the dredging of Whiskey Slough by their predecessor provoked a sudden change in its course, the avulsion rule should apply. Even presuming that this technically was, in fact, an avulsive change, we do not agree.[4]

We have reviewed numerous decisions on this subject and have found that the rules pertaining to accretions, relictions, and avulsions should not be mechanically applied. Rather, each case must be decided on its facts, and

---

[3]Several other explanations for these rules have been offered. One is a de minimis rationale, based on the maxim "de minimis non curat lex." Another explanation is that a riparian owner is compensated for losses due to erosion by allowing gains due to accretion. The Roman theory of accession provides yet another reason, *e.g.*, one acquires title to the apples on his tree, and the offspring of his female livestock. Finally, it has been explained that productivity is favored by allowing a riparian owner to use accreted land, rather than the state or a stranger. *See* 4 B. Jones, *Tiffany, Real Property* § 1219, at 614-15 (3d ed. 1939); Note, Lundquist, *Artificial Additions to Riparian Land: Extending the Doctrine of Accretion.* 14 Ariz. L. Rev. 315 (1972).

The most popular explanation for the accretion doctrine is found in a statement made by the Minnesota court in *Lamprey v. Metcalf*, 52 Minn. 181, 197, 53 N.W. 1139, 1142 (1893): "The incalculable mischiefs that would follow if a riparian owner is liable to be cut off from access to the water, and another owner sandwiched in between him and it, whenever the water line had been changed by accretions or relictions, are self-evident, . . ."

[4]The facts of this case do not fit neatly into the definitions for accretion, reliction, or avulsion. The change in the slough's course was not "gradual and imperceptible," yet it apparently was not rapid and sudden either, for it did not occur to any of the owners of the two parcels for almost 20 years that there might be a problem. We do not believe, however, that the nomenclature of this event is significant. Our result will be the same regardless of the designation.

We do note that there has been some semantical difficulty in this regard among jurists. Artificially induced additions to natural land have been called acretive, notwithstanding the fact that they were neither gradual nor imperceptible. *See, e.g., Bonelli Cattle Co. v. Arizona,* 414 U.S. 313, 38 L. Ed. 2d 526, 94 S. Ct. 517 (1973) (discussed in the text of this opinion). The cases, are, however, in agreement that under certain circumstances, even a sudden and perceptible emergence of land may be treated the same as an accretion.

owners must be afforded equitable treatment. As stated in *Grill v. Meydenbauer Bay Yacht Club,* 61 Wn.2d 432, 437-38, 378 P.2d 423 (1963):

> [A] formula which works well in one situation may be inequitable in another. It is not a matter of applying a particular formula and letting the chips fall where they may. . . . [I]t is desirable that all affected property owners be treated equitably.

In *Hudson House, Inc. v. Rozman,* 82 Wn.2d 178, 183, 509 P.2d 992 (1973) a statement from the Wisconsin case, *Rondesvedt v. Running,* 19 Wis. 2d 614, 620, 121 N.W.2d 1 (1963), was quoted approvingly:

> Where the circumstances are such that the full application of that rule in favor of one riparian owner would destroy or substantially impair the riparian right of another owner to access, we think the rule must yield.

A striking illustration of this analysis may be found in a recent United States Supreme Court decision, *Bonelli Cattle Co. v. Arizona,* 414 U.S. 313, 38 L. Ed. 2d 526, 94 S. Ct. 517 (1973). There the court considered the effect of what technically would be considered an avulsive change, produced by the rechanneling of the Colorado River by the federal government. The State of Arizona argued that since title to the old bed of the river was in the state when the river flowed through it, its title should continue in that bed, even though it is now totally dry. The court disagreed. Applying federal law, it awarded title to the surfaced land to the Bonelli Cattle Company, which was the upland riparian owner along the original channel. The court essentially weighed the interests of the state against those of the upland owner, and decided that a decision favoring the state would be a windfall to it, for the reclaimed land would be wholly unnecessary to any legitimate navigational usage. The court ruled that notwithstanding the "avulsive" nature of the rechanneling, an "accretion" had taken place. The court stated that: "Where accretions to riparian land are caused by conditions created by strangers to the land, the upland owner remains the beneficiary

thereof." *Bonelli Cattle Co. v. Arizona, supra* at 327. (Footnote omitted.)

Precedent for the rationale used in the *Bonelli Cattle Co.* decision may be found in *State v. Gill,* 259 Ala. 177, 66 So. 2d 141 (1953), *Brundage v. Knox,* 279 Ill. 450, 117 N.E. 123 (1917), and *Gillihan v. Cieloha,* 74 Ore. 462, 145 P. 1061 (1915)—these cases holding that new land formed by a stranger using artificial means passes to the riparian owner as an accretion, even though the buildup of land matter was rapid and perceptible. Also, in *United States v. Claridge,* 416 F.2d 933 (9th Cir. 1969), *cert. denied,* 397 U.S. 961, 25 L. Ed. 2d 253, 90 S. Ct. 994 (1970), changes in the course of the Colorado River caused by the Hoover Dam were termed accretive.

A decision from this jurisdiction concerning a dispute over shorelands along Lake Washington is also significant. In *State v. Sturtevant,* 76 Wash. 158, 135 P. 1035 (1913), the State sought to recover possession and quiet title to certain emerging shorelands (this being the land, mostly submerged, extending to the line of navigation). The State was constructing a channel which would lower the level of the lake; certain shoreland would be exposed and the line of navigation would be extended outward by the completion of the project. Riparian rights had been denied the upland owners by the Washington State Constitution, article 17, section 1; ownership was vested in the State up to the line of ordinary high water. Subsequently, by statute, upland owners were given the first right to purchase the right of access to the deep water which had been previously cut off by the constitution. That is, they were allowed to extend their proprietorship to the line of navigation. The court held that when this shoreland was purchased from the State, the right of access to the navigable water was part of the consideration for the deed. The State cannot thereafter destroy this access by lowering the level of the lake. Although technically this was not a reliction, the result would be the same as with land created by

reliction. Therefore, after the completion of the rechanneling project, the title of the shoreland owners would extend to the new line of navigation. As a result of the court's holding, the State lost land. But the court would not allow the State to take advantage of conditions produced by it to deprive shoreland owners of the most important incident of their title.

Suggested in *State v. Sturtevant* is a proposition which finds at least implicit support elsewhere: Unless no harm would occur to other interests, a person may not induce an artificial change in water boundaries, and then claim for himself whatever advantage that change has produced. For example, the accretion doctrine has been held inapplicable to accretions produced artificially by "one riparian owner at the expense of another." 3 *American Law of Property* § 15.29, at 862 (A.J. Casner ed. 1952). *See Michaelson v. Silver Beach Improvement Ass'n,* 342 Mass. 251 173 N.E.2d 273, 91 A.L.R. 846 (1961); *Menominee River Lumber Co. v. Seidl,* 149 Wis. 316, 135 N.W. 854 (1912).

In the instant case, it was defendants' predecessor himself who caused the shift in the course of Whiskey Slough. If the defendants were to prevail in this action, the plaintiffs would lose access to a significant portion of the slough; they would be deprived of a valuable riparian interest. As a result of our decision that the dredging of the slough shifted the boundary between the two parcels to the thread of the new channel, the defendants will not be deprived of a significant portion of their land. Even if the shift in the course of the stream were to be considered avulsive, we find no reason to apply the avulsion rule to this situation.[5] We have considered and weighed the respective interests of the parties, and we find that the accretion-reliction rule should be applied here.

We do not believe, however, that an injunction is appropriate at this time. An injunction should issue only when

[5] *See* footnote 4.

the petitioner is able to show a well-grounded fear of an immediate invasion of a right, along with a substantial injury, either existing or expected. *LeMaine v. Seals,* 47 Wn.2d 259, 287 P.2d 305 (1955). At least from the facts of record, it does not appear that the defendants have in bad faith interfered with the plaintiffs' use and enjoyment of the slough. Prior to 1972, the year the defendants asserted their claim to the slough, the defendants moved their vessels from the slough upon the request of the plaintiffs. It was only after they in good faith believed that they were in fact the owners of the entire slough that they interfered with the plaintiffs' use. There is no reason to believe that the defendants now would not abide by the ruling of this court, and would not honor the plaintiffs' right to their half of the slough.

Reversed and remanded for the entry of an order consistent with this opinion. Judgment of refusal to issue an injunction is affirmed.

ARMSTRONG and PETRIE, JJ., concur.

Petition for rehearing denied December 11, 1974.

Review denied by Supreme Court January 22, 1975.