**PUYALLUP INDIAN TRIBE,**
**Plaintiff-Appellee,**

v.

**PORT OF TACOMA,**
**Defendant-Appellant.**

**No. 81–3480.**

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Jan. 4, 1983.

Decided Aug. 15, 1983.

Rehearing Denied Sept. 14, 1983.

Certiorari Denied Feb. 21, 1984.
See 104 S.Ct. 1324.

---

John Howard Bell, Law Office, Puyallup Indian Tribe, Tacoma, Wash., for plaintiff-appellee.

James J. Mason, Tacoma, Wash., for defendant-appellant.

Before BROWNING, Chief Judge, FLETCHER and PREGERSON, Circuit Judges.

FLETCHER, Circuit Judge:

This case involves a question of title to part of the former bed of the Puyallup River. The Port of Tacoma appeals from a ruling by the district court that the Tribe received title to the riverbed by treaty in 1857 and that a river rechannelization project in 1948–50 that exposed the former riverbed was an avulsive change of the river's course which left title to the bed in the Tribe as the pre-avulsion owner. *See Puyallup Tribe of Indians v. Port of Tacoma*, 525 F.Supp. 65 (W.D.Wash.1981). The Port further challenges the court's ruling that the State of Washington and the United States need not be joined as necessary parties. We have jurisdiction under 28 U.S.C. § 1291 (1976) and affirm.

I

Prior to the arrival of white settlers in the mid-nineteenth century, the Puget Sound area and the rivers that drain into it, including the Puyallup, were inhabited by Indians known as Coast Salish. In 1854, representatives of various bands and groups of these Indians entered into the Treaty of Medicine Creek with the United States. In return for a number of reservations, a guarantee of continued fishing rights, and other promises, the Indians gave up their claim to their aboriginal homeland.

One of the Indian groups that signed the Treaty of Medicine Creek was known as the Puyallup Tribe. These Indians settled on a reservation on the south side of Commencement Bay near present-day Tacoma, Washington. This site did not include access to the Puyallup River and its fishery on which the Puyallup Tribe depended. The Tribe was very dissatisfied with its reservation and agitated vigorously (and sometimes violently) for an enlargement of the reservation to include a section of the river.

The Government recognized the importance of the fishery to the Tribe as well as the importance of pacifying the Tribe to

protect white settlers in the area. In 1856, following a meeting between the Government and the Tribe at Fox Island, the Government recommended an expansion of the Puyallup Reservation to include a section of the Puyallup River. On January 20, 1857, by Executive Order, President Pierce set aside certain land that encompassed a section of the Puyallup River near its mouth as an enlargement of the Puyallup Indian Reservation. *See* A. Josephy, *Now That the Buffalo's Gone* 181–85 (1982).

Over the next 100 years, most of the reservation was allotted to individual Indians and passed into individual Indian and non-Indian ownership. Since the Puyallup River was navigable, the allotments along the river were bounded by the ordinary high water mark of the river. The Port of Tacoma eventually took title to certain of the allotments abutting the north bank of the river.

Between 1948 and 1950, the United States Army Corps of Engineers (Army Corps) "straightened" the Puyallup River, including the section of the river that passed through the reservation. As a result, a twelve-acre tract of the former riverbed was exposed. The Port of Tacoma was the owner of the uplands at the time of the rechannelization. It took possession of the newly exposed riverbed. Since 1950, the Port has had possession and exercised control over the twelve acres of exposed former riverbed and has leased it to industrial tenants.

In 1980, the Puyallup Tribe filed suit claiming beneficial title to the twelve acres of exposed former riverbed. *See* 28 U.S.C. § 1362 (1976). The Tribe based its claim on the 1857 Executive Order granting to it an enlarged reservation that encompassed part of the Puyallup River. Three days before trial, the Port filed a motion based on Federal Rule of Civil Procedure 19(a), requesting that the United States and the State of Washington be joined as necessary parties. The motion was denied.

Following a bench trial, the district court ruled that (1) the 1857 Executive Order

granted to the Tribe title to that part of the Puyallup River bed within the exterior boundaries of the grant; (2) no subsequent transactions had divested the Tribe of this title; (3) the 1948–50 rechannelization of the Puyallup that exposed the former riverbed was an avulsive change of the river's course under Washington law; and (4) consequently, the Tribe's title to the former riverbed was superior to that asserted by the Port of Tacoma. The Port timely appealed from the district court's judgment quieting title in the Tribe and ejecting the Port.

## II

The Port first challenges the district court's refusal to join both the United States and the State of Washington as necessary parties under Federal Rule of Civil Procedure 19(a). We are not persuaded that the district court erred.

■ The United States, as the trustee holding legal title to all real property owned by the Tribe, obviously has an interest in this litigation and it will not be bound by any decree ensuing from this litigation unless it is formally joined as a party. *Fort Mojave Tribe v. LaFollette,* 478 F.2d 1016, 1018 (9th Cir.1973). Absent joinder of the United States, a judgment entered in this case in favor of the Port will not necessarily render complete relief to the Port or protect the Port from inconsistent judgments. *See* Fed.R.Civ.P. 19(a). Nonetheless, the rule is clear in this Circuit and elsewhere that, in a suit by an Indian tribe to protect its interest in tribal lands, regardless of whether the United States is a necessary party under Rule 19(a), it is *not* an indispensable party in whose absence litigation cannot proceed under Rule 19(b). *Fort Mojave Tribe,* 478 F.2d at 1017–18; *Choctaw and Chickasaw Nations v. Seitz,* 193 F.2d 456, 460–61 (10th Cir.1951), *cert. denied,* 343 U.S. 919, 72 S.Ct. 676, 96 L.Ed. 1332 (1952); *see also Oneida Indian Nation of New York*

*v. County of Oneida,* 434 F.Supp. 527, 544–45 (N.D.N.Y.1977) (collecting cases).[1]

■ We now turn to consider the Port's contention that the State of Washington is a necessary party to this proceeding. The Port asserts that the State has an interest in this litigation because, upon admission of Washington to statehood in 1889, it received title to all navigable streams within its boundaries then owned by the United States. *See United States v. Ashton,* 170 F. 509, 512–13 (C.C.W.D.Wash.1909). Thus, if the Tribe had not been granted equitable title to the Puyallup River bed by treaty or by executive order and if the 1948–50 river rechannelization were avulsive, the State, and not the Port or the Tribe, would own the exposed riverbed.

Rule 19(a) requires a district court to join an absent party if any one of three specific conditions obtains: (A) in the absence of the party complete relief cannot be granted to those persons who are already parties, Fed.R.Civ.P. 19(a)(1); (B) the absent party claims an interest relating to the action and is so situated that disposition in his absence may "as a practical matter" impair the absent party's ability to protect that interest, *id.* at 19(a)(2)(i); or (C) the absent party claims an interest relating to the action and is so situated that disposition in his absence may subject a joined party to an inconsistent obligation, *id.* at 19(a)(2)(ii).[2] The "appropriate focus" in determining whether one or more of these conditions exist is on the "practical ramifications of joinder versus nonjoinder." *Northrop Corp. v. McDonnell Douglas Corp.,* 705 F.2d 1030, 1042 & n. 14a (9th Cir.1983). The district court's Rule 19(a) decision will not be reversed absent a showing of abuse of discretion. *Id.* at 1043.

The Port does not specify the particular Rule 19(a) ground upon which it relies. We do not find the State a necessary party under any of the rule's criteria.

Rule 19(a)(1) would require joinder of the State if the court could not otherwise grant "complete relief" to those already parties. *Eldredge v. Carpenters 46 Northern California Counties Joint Apprenticeship and Training Committee,* 662 F.2d 534, 537 (9th Cir.1981). The essence of an action in ejectment, which this case is, is to settle title between the adverse claimant and the party in possession. The district court can therefore provide complete relief to the parties to this action without joining other parties who might also claim an interest in the same land. Accordingly, Rule 19(a)(1) does not require joinder of the State in this ejectment action, even though the State might in the future challenge the title of the Tribe or the Port to the riverbed.

Rule 19(a)(2)(i) seeks to prevent the results of litigation before the court from impairing the legal interests of an absent party. Since the State can assert any interest it might have in another action,[3] no

---

**1.** *Minnesota v. United States,* 305 U.S. 382, 386–88, 59 S.Ct. 292, 294–95, 83 L.Ed. 235 (1939), and *Carlson v. Tulalip Tribes of Wash.,* 510 F.2d 1337, 1339 (9th Cir.1975), do not hold otherwise. In both *Minnesota* and *Tulalip Tribes,* the litigation was instituted by non-Indians for the purpose of effecting the alienation of tribal or restricted lands, not by individual Indians or a tribe seeking to protect Indian land from alienation. *See Oneida Nation,* 434 F.Supp. at 545 (distinguishing cases). Whether the Tribe is the plaintiff or the defendant in any given suit would not seem particularly relevant in a joinder decision under Rule 19(b), according to the factors set forth in the rule. We do not question, however, the distinction established in our circuit by the *Fort Mojave* and *Tulalip Tribes* cases for determining indispensability under Rule 19(b).

**2.** Rule 19(a) provides in pertinent part:

*Persons to be Joined if Feasible.* A person who is subject to service of process and whose joinder will not deprive the court of jurisdiction over the subject matter of the action shall be joined as a party in the action if (1) in his absence complete relief cannot be accorded among those already parties, or (2) he claims an interest relating to the subject of the action and is so situated that the disposition of the action in his absence may (i) as a practical matter impair or impede his ability to protect that interest or (ii) leave any of the persons already parties subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of his claimed interest. If he has not been so joined, the court shall order that he be made a party.

**3.** The State could suffer immediate practical impairment of its interests if, for instance, it were the Port's lessor but was not itself in

legal interest it may have in the riverbed is impaired, regardless of the outcome of this action.[4]

Rule 19(a)(2)(ii) requires joinder to protect a party to the suit from inconsistent obligations by reason of a claimed interest of an absent party. Since the Tribe does not challenge the denial of the Rule 19(a) motion, we need reverse only if it is necessary to protect the Port's legal interests. We see no way in which the outcome of this ejectment action could possibly subject the Port to inconsistent obligations under two conflicting judgments.

A judgment adverse to the Tribe, based on a conclusion that the Tribe never received title to the bed, would not be inconsistent with a subsequent declaration requiring the Port to remove itself in favor of the State. A determination in some later suit between the State and the Port that the State's title is superior to that of the Port, based perhaps on a conclusion that the 1948–1950 rechannelization of the Puyallup was avulsive and not accretive, would simply not be inconsistent with a determination here that the Port's title was superior to that of the Tribe.

Nor would a conclusion in this case that the Tribe could not eject the Port from possession of the riverbed because the 1948–1950 rechannelization was accretive subject the Port to the possibility of inconsistent

obligations. As a "practical" matter, the Port now has possession of the riverbed and will retain possession if it prevails in this litigation. Even if it is determined in a subsequent suit between the State and the Port that the Tribe did not receive title to the exposed riverbed, that the rechannelization was avulsive, and thus that the State has title to the bed, the Port will thereby incur no inconsistent obligations. That it must remove itself in favor of the State is not an obligation inconsistent with a finding that it need not relinquish possession to the Tribe.

If the Tribe prevails, the Port may be ejected and may be contractually liable to its lessees for damages resulting from the ejectment. Such obligations would not be affected by a subsequent determination that the State has superior title to the Tribe. In any event, the Port would never again be entitled to possession.[5]

For these reasons, we conclude that the district court did not abuse its discretion in refusing to join the State of Washington or the United States as a party to this action.

### III

We now turn to the merits. The Port challenges, on two distinct grounds, the judgment of the district court ejecting the Port and quieting title to a portion of the

possession of the riverbed. *See Washington v. United States,* 87 F.2d 421, 428–31 (9th Cir. 1936). Here, however, where neither the State *itself nor any lessee of the State is asserted to* be in possession of the riverbed, no practical impairment of the State's interests can result from an adjudication of who, between the Tribe and the Port, shall have possession of the riverbed.

4.  *McShan v. Sherrill,* 283 F.2d 462, 463–64 (9th Cir.1960), in which we held that landowners asserting a claim to property that was the subject of part of a quiet title action were parties who should have been joined, does not require a contrary conclusion. First, in *McShan,* record title to the land at issue was in the absentees. Hence, *any* adjudication in their absence would "place[ ] a cloud upon the title of the absent landowner." 283 F.2d at 463. By contrast, in the ejectment action before us, a determination of the right to possession between the

Port and the Tribe will not, in any practical sense, place any cloud on any title the State might have, since in any event record title to the property is not in the State. More significantly, while the *McShan* absentees had paid "all taxes" on the property, presumably on the assumption that they in fact owned the property, there is no indication here that the State has incurred any economic detriment in reliance on any purported right of ownership of the riverbed. For this reason as well, we conclude that the possible practical effects of this litigation on the State's interests are of an entirely different order from that of those requiring joinder in *McShan.*

5.  If the Port were to attempt to eject the State after the latter had ejected the Tribe, asserting that the rechannelization was accretive, the Port would meet a collateral estoppel defense based on the necessary finding here that the rechannelization was avulsive.

former riverbed in the Tribe. First, it asserts that the United States did not convey title to the bed of the Puyallup River to the Puyallup Tribe either by treaty or by executive order. It contends that the Tribe lost whatever title it did have to the former bed when the river rechannelization project exposed the bed.

### A

Appellant, citing *Montana v. United States,* 450 U.S. 544, 101 S.Ct. 1245, 67 L.Ed.2d 493 (1981), argues that the district court erred as a matter of law in concluding that the United States conveyed title to the bed of the Puyallup River to the Puyallup Tribe. Appellee counters that the district court's conclusion on the issue of riverbed ownership is in accord with the Supreme Court's decision in *Montana v. United States* and that the district court's decision is supported by findings of fact which are not clearly erroneous. We agree with both parties to the extent that we find *Montana v. United States* controlling on the question of riverbed ownership. Accordingly, our analysis of the Tribe's claim of ownership of part of the former bed of the Puyallup River must begin with a close examination of the *Montana* decision.

■ In *Montana v. United States,* the Supreme Court considered a tribe's claim of title to the bed of a navigable river as it flowed through the tribe's reservation. 450 U.S. at 550–57, 101 S.Ct. at 1250–54. The Court's analysis of this issue starts from the premise that "[a] court deciding a question of title to the bed of a navigable water must ... begin with a strong presumption against conveyance by the United States, ... and must not infer such a conveyance 'unless the intention was definitely declared or otherwise made very plain.'" *Id.* at 552, 101 S.Ct. at 1251 (quoting *United States v. Holt State Bank,* 270 U.S. 49, 55, 46 S.Ct. 197, 199, 70 L.Ed. 465 (1926)). At the same time, the Court did not reject the analysis

of *Choctaw Nation v. Oklahoma,* 397 U.S. 620, 90 S.Ct. 1328, 25 L.Ed.2d 615 (1970), in which the "Court did construe a reservation grant as including the bed of a navigable water." *See Montana,* 450 U.S. at 555–56 n. 5, 101 S.Ct. at 1253–54 n. 5. Nor did it gainsay the equally important proposition set forth in *Choctaw Nation* that "treaties with the Indians must be interpreted as they would have understood them, ... and any doubtful expressions in them should be resolved in the Indians' favor." 397 U.S. at 631, 90 S.Ct. at 1334.[6] Thus, when faced with a claim by an Indian tribe that it owns the bed of a navigable stream that flows through its reservation, we must accord appropriate weight to both the principle of construction favoring Indians and the presumption that the United States will not ordinarily convey title to the bed of a navigable river. *See Confederated Salish and Kootenai Tribes v. Namen,* 665 F.2d 951, 961–62 (9th Cir.), *cert. denied,* —— U.S. ——, 103 S.Ct. 314, 74 L.Ed.2d 291 (1982).

The Supreme Court's opinion in *Montana* provides considerable guidance as to how a court can give proper effect to both the presumption against conveyance and the principle of construction favoring Indians. First, the Court recognized that "establishment of an Indian reservation can be an 'appropriate public purpose' within the meaning of *Shively v. Bowlby,* 152 U.S. [1, 48, 14 S.Ct. 548, 566, 38 L.Ed. 331 (1894) ], justifying a congressional conveyance of a riverbed ...." 450 U.S. at 556, 101 S.Ct. at 1253. However, the Court also cautioned that "[t]he mere fact that the bed of a navigable water lies within the boundaries described in the treaty does not make the riverbed part of the conveyed land, especially when there is no express reference to the riverbed that might overcome the presumption against its conveyance." *Id.* at 554, 101 S.Ct. at 1252. The Court cited two cases, apparently to illustrate proper resolu-

---

**6.** This principle of treaty construction applies with equal force to statutes passed for the benefit of Indians, *Alaska Pac. Fisheries v. United States,* 248 U.S. 78, 89, 39 S.Ct. 40, 41, 63 L.Ed. 138 (1918), and to executive orders,

*Moore v. United States,* 157 F.2d 760, 762 (9th Cir.1946); *see Skokomish Indian Tribe v. France,* 320 F.2d 205, 207–08 (9th Cir.1963), *cert. denied,* 376 U.S. 943, 84 S.Ct. 797, 11 L.Ed.2d 767 (1964).

tions in the face of the competing principles: *Alaska Pacific Fisheries v. United States* and *Skokomish Indian Tribe v. France. See id.* at 556, 101 S.Ct. at 1253.

In *Alaska Pacific Fisheries v. United States,* 248 U.S. 78, 39 S.Ct. 40, 63 L.Ed. 138 (1918), the Court was called on to decide whether a grant by Congress of "the body of lands known as Annette Islands" to the Metlakahtla Indians included the submerged lands surrounding and between the islands. The Court reviewed the history of the Annette Island Reservation and the Indian community and found:

> The Indians could not sustain themselves from the use of the upland alone. The use of the adjacent fishing grounds was equally essential. Without this the colony could not prosper in that location. The Indians naturally looked on the fishing grounds as part of the islands and proceeded on that theory in soliciting the reservation.

*Id.* at 89, 39 S.Ct. at 41. Accordingly, the Court concluded that not only was Congress aware of the Indians' reliance on the adjacent fishing grounds but also, in view of the importance of fishing to the Indians,

> Congress . . . did not reserve merely the site of their village, or the island on which they were dwelling, but the whole of what is known as Annette Islands . . . embracing the intervening and surrounding waters as well as the upland. . . .

*Id.*

In *Skokomish Indian Tribe v. France,* 320 F.2d 205 (9th Cir.1963), this court found that an Executive Order granting certain sections of land along the Hood Canal to the Skokomish Indians did not include a grant to the Tribe of tidelands below the ordinary high water mark. *Id.* at 210. The dispositive factor in construing the Executive Order to exclude a grant of the tidelands was the fact that the Tribe did not rely on the particular tidelands included in

the reservation as an important source of food.

> The use of the tidelands by the Indian tribe, as disclosed by the evidence, does not support appellant's contention that the tidelands were essential to the Indians' livelihood and that the Indians accordingly must have understood they were to have the tidelands.
>
> . . . .
>
> It is true that shellfish and other forms of sea life were gathered by the Skokomish along the canal . . . . "[T]he usual locations at which shellfish were procured were miles from the reservation and were reached by canoe travel on Hood Canal"; and . . . "the tidelands in issue, particularly in Section 26, are not and were not a source of native shellfish in usable quantities."

*Id.* at 210–11.

From the facts of *Skokomish Tribe* and *Alaska Pacific Fisheries,* we conclude that where a grant of real property to an Indian tribe includes within its boundaries a navigable water and the grant is made to a tribe dependent on the fishery resource in that water for survival, the grant must be construed to include the submerged lands if the Government was plainly aware of the vital importance of the submerged lands and the water resource to the tribe at the time of the grant.[7] In such a situation, the Government's awareness of the importance of the water resource to the Tribe taken together with the principle of construction resolving ambiguities in transactions in favor of the Indians warrants the conclusion that the intention to convey title to the waters and lands under them to the Tribe is "otherwise made very plain" within the meaning of *Holt State Bank,* 270 U.S. at 55, 46 S.Ct. at 199, *quoted in Montana,* 450 U.S. at 552, 101 S.Ct. at 1251.

This conclusion is confirmed by the penultimate paragraph of that section of the

---

7. We do not mean to suggest that this is the only circumstance in which the United States may be found to have granted the bed of a navigable water to an Indian tribe, but it is certainly one of the clearest. *See Confederated Salish and Kootenai Tribes v. Namen,* 665 F.2d 951, 961–62 (9th Cir.), *cert. denied,* —— U.S. ——, 103 S.Ct. 314, 74 L.Ed.2d 291 (1982).

*Montana* decision dealing with the question of title to the Big Horn River bed:

> Moreover, even though the establishment of an Indian reservation can be an "appropriate public purpose" within the meaning of *Shively v. Bowlby,* 152 U.S., at 48 [14 S.Ct. at 566], justifying a congressional conveyance of a riverbed, see, *e.g., Alaska Pacific Fisheries v. United States,* 248 U.S. 78, 85 [39 S.Ct. 40, 40, 63 L.Ed. 138], the situation of the Crow Indians at the time of the treaties presented no "public exigency" which would have required Congress to depart from its policy of reserving ownership of beds under navigable waters for the future States. See *Shively v. Bowlby, supra,* at 48 [14 S.Ct. at 566]. *As the record in this case shows, at the time of the treaty the Crows were a nomadic tribe dependent chiefly on buffalo, and fishing was not important to their diet or way of life.* 1 App. 74. Cf., *Alaska Pacific Fisheries v. United States, supra,* at 88 [39 S.Ct. at 41]; *Skokomish Indian Tribe v. France,* 320 F.2d 205, 212 (CA9).

450 U.S. at 556, 101 S.Ct. at 1253–54 (emphasis added); *see also id.* at 570, 101 S.Ct. at 1259 (Blackmun, J., dissenting in part) (accepting majority's analysis, but concluding that there was a "public exigency" requiring Congress to convey bed of Big Horn River to tribe, since, *inter alia,* fishing was important to the Crow Tribe). Further, the recent Ninth Circuit decision in *Confederated Salish and Kootenai Tribes v. Namen* supports the conclusion that title to land submerged under navigable waters may pass to the tribe whose reservation encompasses the navigable water where that tribe is dependent on the water's resources for survival. 665 F.2d at 962 (the importance of fishing to the Kootenai Tribe cited as one of several factors distinguishing *Namen* from *Montana*).

■ In order to apply the teachings of *Montana* to the case before us, we review briefly those facts relevant to a determination of whether the United States made plain its intention to convey to the Puyallup Indians that portion of the Puyallup River bed that runs through their reservation.

The Puyallup Tribe was one of the signatory tribes to the 1854 Treaty. Treaty of Medicine Creek, December 26, 1854, 10 Stat. 1132, 1132; *see also* A. Josephy, *Now That the Buffalo's Gone* 181–82 (1982). The Puyallup Indians have occupied the area around the Puyallup River, Commencement Bay, and surrounding parts of Southern Puget Sound since time immemorial. At the time the Tribe entered into the 1854 Treaty, its members " 'were heavily dependent upon anadromous fish for their subsistence and for trade with other tribes and later with the settlers. Anadromous fish was the great staple of their diet and livelihood. They cured and dried large quantities for year-round use, both for themselves and for others through sale, trade, barter and employment.' " *Washington v. Washington State Commercial Passenger Fishing Vessel Association,* 443 U.S. 658, 665 n. 6, 99 S.Ct. 3055, 3064 n. 6, 61 L.Ed.2d 823 (1979) (quoting *United States v. Washington,* 384 F.Supp. 312, 406 (W.D.Wash.1974)). Indeed, as the district court found, "[f]or Puyallup Indians, the fresh water courses of the area [from which they caught anadromous fish] were the center of their world and their lives. . . . Puyallup Indians conceived of their territory as the Puyallup River and the surrounding land. . . . The Puyallups' spiritual, religious and social life centered around the river." *Puyallup Tribe of Indians v. Port of Tacoma,* 525 F.Supp. at 71. Governor Issac Stevens, who was primarily responsible for negotiating the Treaty of Medicine Creek with the Indians on behalf of the United States, was aware of the importance of the fisheries to the Indians. *Fishing Vessel Association,* 443 U.S. at 666, 99 S.Ct. at 3064. Nonetheless, the original treaty of 1854 granted the Puyallups a reservation removed from their river without ready access to their traditional fishing and village sites. In return for this unsuitable reservation, the Tribe relinquished its interest in its lands around Puget Sound so that the area could be opened for white settlement. *See generally* A. Josephy, *Now That the Buffalo's Gone* 181–85 (1982).

Needless to say, the Puyallups quickly recognized the inadequacy of their original reservation. As the district court found:

Soon after the [1854] Treaty was signed, fighting broke out between Indians and non-Indians in the area, resulting in the deaths of many non-Indian settlers. Among the causes of those hostilities was the inadequacy of the area set aside as the Puyallup Reservation. One of the shortcomings of the Reservation was that it did not include the Tribe's traditional fishing areas and villages along the Puyallup River.

*Puyallup Tribe of Indians v. Port of Tacoma,* 525 F.Supp. at 72. The district court went on to find, based on expert testimony and documentary evidence, the following facts of particular importance to the question of riverbed ownership raised in the instant case:

The United States sought to end ... hostilities and gain peace [with the Puyallup and other Indians] by convening the Fox Island Council. The United States representatives expressed their awareness that the cause of the hostilities was the inadequacy of the Puyallup Reservation. Governor Stevens reminded the Indians that he had promised to modify the treaty reservations if they were unsuitable....

Stevens recognized and emphasized the importance of the Puyallup River when he spoke of the location of the expanded reservation.

You shall have a large Res. at Nisqually, one large Res. on the Puyaloop [sic] .... Now my children do you want a Res. on the Nisqually and one on the Puyaloop [sic], I will send word to the Great Father if you want Res. at those places.

The Indians at the [Fox Island] Council also stressed the importance of the river, which such statements as:

I know that my people all want to live on the Puyallup [Stanop-se, a Puyallup].

and

I am glad my people are going to have a Res. on the Puyallup. That is my home. [Old Simon, a Puyallup].

....

The parties at the Fox Island Council thus agreed to expand the Puyallup Reservation to include the lower portion of the Puyallup River. The Commissioner of Indian Affairs and Secretary of Interior recommended that the agreement be adopted. President Pierce approved those recommendations in an Executive Order of January 20, 1857. Those recommendations show that the reservation was expanded pursuant to Article 1 of the Treaty of Medicine Creek. The expanded reservation included the property involved in this case.

*Id.* It is in light of these pertinent facts that we must apply *Montana v. United States.*[8]

The findings of the district court support the conclusion that the 1857 Executive Order was a response to a public exigency—avoiding hostilities between the Indians and settlers so that the Puget Sound area could be opened safely for settlement. *See United States v. Montana,* 450 U.S. at 556, 101 S.Ct. at 1253 (citing *Shively v. Bowlby,* 152 U.S. at 48, 14 S.Ct. at 566).[9] The intention to convey title to the riverbed to the Puyallup Tribe was made very plain by the nego-

---

**8.** The district court's findings of fact, quoted above, are not clearly erroneous. For the most part, the district court relied on the expert testimony of Dr. Barbara Lane as the basis for its findings with respect to the historical facts surrounding the Treaty of Medicine Creek, the Fox Island Council, the United States' interest in those proceedings, and the way of life and understanding that the Puyallup Tribe brought to the negotiations with the United States. Dr. Lane's expertise in this area was recognized in *United States v. Washington,* 384 F.Supp. 312,

350 (W.D.Wash.1974), and the Port has offered no reason to doubt the reliability of her testimony.

**9.** The Tribe does not contend that the 1854 Treaty of Medicine Creek conveyed title to the bed of the Puyallup River to it. Rather, it relies on the 1857 Executive Order, which expanded the reservation under the terms of the Treaty, as the conveying agreement.

tiations between Governor Stevens and the Tribe at Fox Island. First, as in *Alaska Pacific Fisheries,* it was important to the Indians who met at Fox Island to have dominion not only over the water but also over the land submerged beneath the water. *Compare Alaska Pacific Fisheries,* 248 U.S. at 87–90, 39 S.Ct. at 41–42 (Indians sought to control non-Indian fish-trap built on submerged lands near the shore of the Annette Islands) *with Puyallup Tribe of Indians v. Port of Tacoma,* 525 F.Supp. 65, 71 (W.D. Wash.1981) (Puyallup harvested fish with wiers and traps, "substantial structures which spanned the width of the river [and] were firmly implanted in the bed of the river"). Second, and more important, unlike the situation in *Montana,* where the Crow Reservation was designated without special regard to the fact that it included a section of the Big Horn River, the Puyallup Reservation, at the insistence of the Indians, was enlarged specifically to include a segment of the Puyallup River.

■ The appellant does not seriously argue that the Puyallups would have understood the 1857 grant of land in any way other than as a conveyance to them of a section of the Puyallup River. Accordingly, we hold that there is sufficient evidence in this case of an intent to convey lands beneath navigable waters to the Tribe to support its claim of beneficial ownership of the former Puyallup River bed. *See United States v. Aranson,* 696 F.2d 654, 664–66 (9th

Cir.1983). The district court's decision on this point is therefore affirmed.[10]

♠

### B

The Port further contends that, even if the 1857 Executive Order granted title to the riverbed to the Tribe, the rechannelization of the riverbed in 1948–50 shifted title to the bed to the Port, the owner of the uplands adjoining the pre-channelization riverbed. By contrast, the Tribe argues that the district court properly concluded that the change in the location of the river resulting from the rechannelization by the Army Corps was "avulsive" under Washington property law and thereby left title to the riverbed in the Tribe, the party who owned the property immediately prior to the rechannelization. We conclude that the Tribe has the better position.[11]

■ The Puyallup River was navigable at the time allotments to the predecessors in title to the Port were made. Since grants of property bounded by a navigable river are deemed to be bounded by the ordinary high water mark of that river, *see Montana Power Co. v. Rochester,* 127 F.2d 189, 192 (9th Cir.1942), the district court correctly ruled that the allotments of land adjoining the river made by the United States, on behalf of the Tribe, to the predecessors in title of the Port were bounded by the ordinary high water mark of the Puyallup River. *See* 525 F.Supp. at 76. Thus, after the allotments were made, the Tribe

---

10. The Port's further arguments against the conclusion that the Tribe received title to the bed of the Puyallup River in 1857 are meritless. The appellee, Puyallup Tribe, is the successor to the tribe that received title to the river in 1857. *See Puyallup Tribe v. Department of Game of Washington,* 433 U.S. 165, 169 n. 7, 97 S.Ct. 2616, 2619 n. 7, 53 L.Ed.2d 667 (1977) (*Puyallup III*); F. Cohen, *Handbook of Federal Indian Law* 6 (1982 ed.). An Executive Order may convey title to land to an Indian tribe as effectively as any other conveyance from the United States. *See* F. Cohen, *supra,* at 472, 493–97 ("Generally, property rights in executive order reservations are similar to those in reservations created pursuant to treaty or statute . . . .").

   Finally, the Port of Tacoma asserts that footnote 12 in *Puyallup III* bars the conclusion that

the Tribe holds title to any part of the former Puyallup River bed. But as the Supreme Court acknowledged in that footnote, a claim of riverbed ownership was not even raised in *Puyallup III* and hence could not have been decided by the Court.

11. Under *Wilson v. Omaha Indian Tribe,* 442 U.S. 653, 671 & n. 8, 676, 99 S.Ct. 2529, 2539, & n. 8, 2542, 61 L.Ed.2d 153 (1979); the question of ownership of land that is allegedly part of an Indian reservation and has allegedly never been conveyed away by the United States or by the Tribe is an issue of federal law to be settled by reference to local law. *See United States v. Aranson,* 696 F.2d 654, 658 (9th Cir.1983). Hence, Washington property law rules are incorporated into federal law to determine whether the Tribe now has title to the riverbed.

continued to have title to the riverbed of the Puyallup River within the reservation bounded on each side by the ordinary high water marks of the river.

For this reason, the common boundary of the properties to which the Port and the Tribe had title in 1948 was defined by the ordinary high water mark of the Puyallup River.[12] Consequently, we must consider whether the movement of the Puyallup River in 1948–1950 was an "avulsive" or an "accretive" change under Washington law. If the rechannelization were avulsive, title to the bed is in the Tribe. If accretive, the title to at least some, if not all, of the riverbed now lies in the Port as upland owner on one side of the bed, and the Tribe would have no basis for ejecting the Port.[13]

■ Several Washington cases make clear that whether a change in a physical aspect of a river is avulsive under Washington law depends on the *suddenness* and the *size* of the change. Where the change is both sudden and significant, the change is avulsive and the real estate boundaries dependent on the physical aspect of the water course are deemed fixed from that point onward as they were in fact immediately before the avulsive change took place.

In *Ghione v. State,* 26 Wash.2d 635, 650, 175 P.2d 955, 962 (1946), for example, the Washington Supreme Court held that where a navigable riverbed had shifted by "a slow and continuous process," the boundary between the upland owner and the riverbed owner, defined as the ordinary high water mark of the river in the original grant, shifted along with the actual ordinary high water mark of the river. *See id.* (citing cases). Similarly, in *Harper v. Holston,* 119 Wash. 436, 443, 205 P. 1062, 1064 (1922), the court held that where the actual meander line of a non-navigable stream had not moved by any "sudden or violent changes," the boundary of a tract described as the meander line of the stream was in accordance with the actual meander line.

By contrast, in *Parker v. Farrell,* 74 Wash.2d 553, 555–56, 445 P.2d 620, 622–23 (1968), the court held that where a "log jam" caused a river to "suddenly change[ ] its flow" and to move 500 feet to the south, the boundary of a tract defined as the thread of the river remained at the location where the thread of the river had been immediately before the change. Likewise, in *Ghione,* the court held that where a riverbed dried up as the result of a project of a commercial waterway district, the change was avulsive and left ownership of the former riverbed, now dry, in the party who had owned the riverbed when submerged. 26 Wash.2d at 651, 659–60, 175 P.2d at 962, 965.

■ The district court did not specifically find that the change in the configuration of the Puyallup during the rechannelization project in 1948–50 was sudden and significant. Rather, the court simply determined

---

12. The Port does not challenge the district court's conclusion that all changes in the configuration of the Puyallup River from the date allotments were first made in 1886 up to the date of rechannelization were accretive changes under Washington law. *See* 525 F.Supp. at 76–77. The common boundary of the riverbed and the allotted property therefore changed over the years between 1886 and 1948 to conform to the actual ordinary high water mark of the river. Thus, in 1948, immediately prior to the rechannelization, the Tribe had title to the riverbed of the Puyallup, bounded by the ordinary high water marks of the river as they then lay. *See Ghione v. Washington,* 26 Wash.2d 635, 650, 175 P.2d 955, 962 (1946) (where bank of river forms boundary of two estates, the boundary changes with accretive changes in river bank).

13. The accretion/avulsion principle of Washington real property law is an interpretive rule used in construing the terms of a grant describing the boundaries of real estate in words relating to a physical aspect of a river, *e.g.,* a river's "ordinary high water mark," or its "thread." The rule is based largely on the implied if not actual concerns of the owners of real estate.

The Washington Supreme Court has summarized the principle as follows:

When the course of the stream changes, the boundary line may or may not shift with the stream. If the change is slow and imperceptible so that it may be classified as accretion or reliction, the boundary line shifts. If, however, the change of the stream is avulsive, the original boundary line remains.

*Parker v. Farrell,* 74 Wash.2d 553, 554–55, 445 P.2d 620, 622 (1968) (footnote omitted).

that the Army Corps had in fact "removed the river from its channel . . . and relocated it in the artificially constructed channel, leaving the property exposed as upland on the bank of the river." 525 F.Supp. at 73–74. Nevertheless, the record nowhere indicates, nor does the Port argue, that the movement of the river southward by at least half its width in a period of less than two years was not in fact sudden and significant as opposed to gradual and imperceptible. Under the principles set forth by the Washington Supreme Court, the change in the banks of the river resulting from the Army Corps project falls squarely within the category of avulsive changes. Consequently, we conclude that the district court correctly ruled that the Tribe holds title to the Puyallup riverbed as it existed immediately before the 1948–50 change.

The Port argues strenuously that, even if the 1948–50 change should ordinarily be treated as avulsive, *Strom v. Sheldon,* 12 Wash.App. 66, 527 P.2d 1382 (1974), requires a finding that the riverbed accreted to the property of the Port, the pre-change upland owner. This contention is meritless.

In *Strom,* one of two landowners whose properties were bounded by the "thread" of a stream dredged the stream, moving the stream onto his property, and thereby left the former thread of the stream on dry land. *Id.* 527 P.2d at 1383. As a result, the lot line of the non-dredging neighbor would have terminated far short of the river if the avulsive change rule were applied. *Id.* While assuming that the change in the river flow was in fact avulsive, the *Strom* court invoked a theory of "equitable treatment" first described by the Washington Supreme Court in an earlier case involving lakeshore navigation rights and refused to hold that the boundary line between the two property owners remained at the thread of the river immediately before the assumedly avulsive dredging. *Id.* 527 P.2d at 1384–86. Em-

phasizing that it was the "defendants' predecessor himself who caused the shift in the course" of the river and that to apply the avulsive rule would deprive the plaintiffs of a "valuable riparian interest," *id.* 527 P.2d at 1386, the court ruled that the boundary line shifted along with the actual meander line of the stream, despite the avulsive change.

We do not read the decision of the Washington court of appeals in *Strom* to effect a radical abandonment of the well-settled principles governing real estate boundaries defined by physical aspects of watercourses in favor of a system of ad hoc determinations based on "equitable treatment" of the parties for all cases in which the allegedly avulsive change was the product of human as opposed to natural activity. To do so would be to ignore the decision of the Washington Supreme Court in *Ghione v. State,* where the court held that a change in the configuration of a river resulting from a commercial waterway project was avulsive. *See* 26 Wash.2d 635, 655, 659–60, 175 P.2d 955, 962, 965 (1946).

Rather, we construe *Strom* to carve out a limited exception where (1) one of the two conflicting landowners has in fact caused the river change which would otherwise be characterized as avulsive *and* (2) the other landowner would be deprived of river access by such a characterization. This is the more natural reading of the court's repeated emphasis in *Strom* of the fact that it was the acts of the defendants' own predecessor that caused the allegedly avulsive change. Since the Tribe was not responsible for the rechannelization, the special principle of "equitable treatment" espoused in *Strom* is inapplicable. The ordinary avulsive change rule fully applies.[14]

### IV

For the reasons set forth above, we affirm the district court's ruling that the

---

**14.** The Port also contends that the district court abused its discretion in not certifying to the Washington Supreme Court the question of whether the change caused by the rechannelization of the Puyallup River was avulsive or accretive. *See Lehman Brothers v. Schein,* 416 U.S. 386, 390–91, 94 S.Ct. 1741, 1743–44, 40 L.Ed.2d 215 (1974). This contention is meritless. Whatever further clarity certification would have provided, since the Washington law is rather well-defined, the trial judge's refusal to certify was not an abuse of discretion.

State of Washington and the United States need not be joined. We further affirm its well-considered determination that the Executive Order of 1857 granted title to the riverbed to the Tribe and that the rechannelization resulted in an avulsive change in the Puyallup River, fixing the boundaries of the riverbed property owned by the Tribe by the location of the ordinary high water marks of the river immediately before the relocation of the river.

AFFIRMED.