[No. 36339. En Banc. February 7, 1963.]

EMILY S. GRILL *et al., Appellants,* v. MEYDENBAUER BAY YACHT CLUB *et al., Respondents.*[*]

[*]Reported in 378 P. (2d) 423.

*Jones, Grey, Kehoe, Hooper & Olsen* and *Richard I. Sampson*, for appellants.

*Donald D. Fleming*, for respondent Meydenbauer Bay Yacht Club.

*Skeel, McKelvy, Henke, Evenson & Uhlmann* and *Guttormsen, Scholfield, Willits & Ager*, for Donnally *et al.*

*The Attorney General* and *Harold T. Hartinger, Assistant*, for respondent State of Washington.

HILL, J.—This case has heretofore been before this court; see *Grill v. Meydenbauer Bay Yacht Club* (1961), 57 Wn. (2d) 800, 359 P. (2d) 1040. The opinion in that case gave the factual background which will not be repeated here. That opinion, likewise, clearly stated the problems posed by this litigation, and it must be read for an understanding of what we here decide.

We must first determine whether the outer or lakeward line of the shorelands of the plaintiffs and defendants, *i.e.,* the "line of ordinary navigation," is as fixed by Judge Raymond Royal in his "partial summary judgment" of

March 23, 1960, and adhered to by Judge George Revelle in his final judgment of November 22, 1961.

Judge Royal made the following finding of fact:

"The line of navigability abutting the properties of the parties as it existed prior to the lowering of Lake Washington coincides with the present shore line of the lake where said lake touches the unsubmerged properties of the parties." (Finding No. 16, p. 636)

This finding, based in part on a stipulation of the appellants' predecessors in interest, is of no particular importance in the determination of the line of navigability as it now exists, but is of significance in making clear the extent of the original shorelands which are now for all practical purposes transformed into uplands.

This means that the present shore line was the outer-boundary line of the shorelands acquired by the predecessors in interest of practically all of the parties to this action. What they own of submerged land today is theirs —not by virtue of the original grant of the shorelands, but because the state of Washington (by reason of the then contemplated lowering of Lake Washington which became *fait accompli* in 1916) extended the shorelands

". . . to . . . the line of ordinary navigation as the same shall be found in such waters after such lowering, and there is hereby granted and confirmed to every such purchaser [of second class shorelands], his heirs and assigns, all such lands: . . ." Laws of 1913, chapter 183, § 1, p. 667;[1] RCW 79.16.380.

The purpose of this grant to the then owners of the

---

[1]Laws of 1913, chapter 183, § 1, insofar as here material reads:

"In every case where the State of Washington has heretofore sold to any purchaser from the state any second class shore lands bordering upon navigable waters of this state by description wherein the water boundary of the land so purchased is not defined, such water boundary shall be held and is hereby declared to be the line of ordinary navigation in such water; and whenever such waters have heretofore been or shall hereafter be lowered by any action done or authorized either by the State of Washington or the United States such water boundary shall thereafter be held and is hereby declared to be the line of ordinary navigation as the same shall be found in such waters after such lowering, and there is hereby granted and confirmed to every such purchaser, his heirs and assigns, all such lands: . . ."

shorelands is explained in *State v. Sturtevant* (1913), 76 Wash. 158, 163, 135 Pac. 1035, 1037. The court there begins by pointing out that the people of the state of Washington have asserted:

" . . . 'ownership to the beds and shores of all navigable waters in the state up to and including the line of . . . ordinary high water within the banks of all navigable rivers and lakes.' Constitution, art. 17, § 1. This declaration destroyed all riparian right in tide and shore lands, and affirmed the right of the state to absolutely control and dispose of these lands in any way or to whomsoever the legislature might ordain."

And the court then points out that the first legislature undertook to compensate in some degree the owners of the uplands for the loss of their riparian rights by giving each the preference right to purchase the abutting shorelands, thus giving each upland owner the opportunity of access to navigable water. The court said:

"Since the formation of the state, the right of an owner of second class shore land to extend his proprietorship up to the line of navigation has not been questioned. It has been taken for granted as a right substituted for the loss, or rather denied, right of riparian proprietorship. . . ." (Id. at 165, 135 Pac. 1037)

The court then asserted that it was to protect that access to navigable water (in consequence of the lowering of Lake Washington by artificial means) that led the legislature to enact the 1913 legislation under which these parties claim.

The plaintiffs' concept of a line of navigation is linked to a depth required to float the steamboats that used to ply the lake and is associated with the use of navigable water for trade and commerce, though they are willing to compromise on a depth of 8 feet.

They urged the establishment of a line of navigation, at that depth, across Meydenbauer Bay, which would be 349.61 feet[2] in length with an original shore line around the elongated bay, inside of that line of navigation, of some 3515 feet.[2] To give the owners of the shorelands, inside the

---

[2] These figures taken from "Proportional Calculation Data" contained on map offered by plaintiffs.

line of navigation, access to it, the plaintiffs insist on the adoption of a formula referred to in *Spath v. Larsen* (1944), 20 Wn. (2d) 500, 148 P. (2d) 834, whereby, on a deep bay or cove, a base line is drawn across the bay as the line of navigation and each owner gets the same proportion of the base line (line of navigation) that his portion of the shore line bears to the total shore line around the bay, with converging lines from the divisions at the shore to the corresponding points on the base line.

■ This is one of numerous suggestions in *Commonwealth v. City of Roxbury* (1857), 75 Mass. 451 (9 Gray). That case was concerned with the area of tidelands each upland owner was to receive. What may be a desirable formula where the area of shorelands or tidelands to be divided is the desideratum, is not necessarily a desirable or practicable formula where the access to navigable water is the right with which the parties are primarily concerned.

The Massachusetts court in *Iris v. Town of Hingham* (1939), 303 Mass. 401, 405, 22 N. E. (2d) 13, 15, said that it should be applied "wherever practicable," but that

" . . . these general rules cannot be used in a particular case where the physical characteristics of the locus are so peculiar and unusual that the application of these rules would be inequitable. *Walker v. Boston & Maine Railroad*, 3 Cush. 1, 22. *Tappan v. Boston Water Power Co.* 157 Mass. 24, 29."

The Michigan Supreme Court, with the matter of access in mind, speaking of the rule for which the plaintiffs contend, said that it "may require modification under particular circumstances in order to secure equal justice." *Blodgett & Davis Lbr. Co. v. Peters* (1891), 87 Mich. 498, 507, 49 N. W. 917, 919, 24 Am. St. Rep. 175.

The plaintiffs' formula, applied to the present situation, produces completely unconscionable results—with some landowners having less than 6 feet of frontage on the line of navigability, for which the plaintiffs contend, which is totally inadequate for any usable access. Instead of conceding the need of some modification in the interests of equity and justice, the plaintiffs assert that they are not

concerned with equity or justice and that it is solely a question of law. In oral argument they indicated that if any landowner needed more access to the line of navigation, he should have bought more uplands along the lake and had a longer shore line; thus he would have been able to buy more shorelands and have secured a greater proportionate length on the line of navigation which the plaintiffs would establish.

■ The defendants, or their predecessors in interest, had adequate access to navigable water before the lake was artificially lowered;[3] and it was clearly the intent of the legislature that their shorelands were to continue to have adequate access to the "line of ordinary navigation."

We are satisfied that when the legislature used the word "ordinary," with reference to the line of navigation for second-class shorelands, they had in mind the necessity of making the line of navigation (to which, by this act of 1913, they were giving away the property of the state) comport to what was necessary and desirable for the "ordinary" uses to which the Lake Washington second-class shorelands[4] were being put. These shorelands were, by definition "more than two miles from the corporate limits of any city." The interest of the public was protected, so far as sites for slips, docks, wharves, and other public purposes were concerned, by the second section of the 1913 act, now RCW 79.16.400.

The courts are aware of the fact that physical characteristics of the bays, coves, and inlets present so many peculiarities that a formula which works well in one situation may be inequitable in another. It is not a matter of applying

---

[3]Attention is again directed to the finding that the present shore line was the line of navigation when these shorelands were acquired from the state.

[4]Second-class shorelands lie "between the line of ordinary high water and the line of navigability" on the shores of navigable lakes or rivers not subject to tidal flow and "more than two miles from the corporate limits of any city." RCW 79.01.032. First legislation distinguishing between first and second-class shorelands was Laws of 1897, chapter 89, p. 229, and that placed them more than 2 miles from the corporate limits of any city or town.

a particular formula and letting the chips fall where they may. As pointed out in *Mutual Chem. Co. v. Mayor & City Council of Baltimore* (1940), 33 F. Supp. 881, it is desirable that all affected property owners be treated equitably. This is particularly true where all the contending parties have title only by grace of a special grant from the state and for a recognized purpose.

The trial court found that there was a navigable channel (some 125 feet in width) extending some 500 feet inward (shoreward) from the line of navigation, for which the plaintiffs contended; the side lines and inner connecting end line of this channel, represented the ordinary line of navigation; and with these lines established an obviously fair and equitable division of the shorelands was possible, giving to each shoreland owner a practicable access to navigable water.

The side lines, running from the present shore line to the line of ordinary navigation over which there was some controversy, were properly fixed by the trial court. The evidence supports the material findings and the findings support the judgment. We find no error in the record of which the plaintiffs can complain.

██ Error, if any there was, rests in the superior court's assuming the responsibility, at the plaintiffs' insistence, of fixing the line of ordinary navigation as contemplated by Laws of 1913, chapter 183. The fixing of such a line, in this area, dividing as it does private ownership from that of the state, was committed to the Commissioner of Public Lands by that act and now rests with the Harbor Line Commission; and a mandamus action to compel that commission to proceed to perform its duty was the proper mode of procedure, rather than to impose upon the courts a responsibility for fixing a line of navigation for which their qualifications are somewhat less than ideal. However, in the instant case, the court, at the insistence of the plaintiffs, undertook that responsibility and did a most acceptable job to all concerned (except the plaintiffs)—even to the adoption by the Harbor

Commission of the line established by the court as the inner harbor line, which is the line of navigation.

The judgment is affirmed.

ALL CONCUR.

May 7, 1963. Petition for rehearing denied.

