[No. 55965–1.    En Banc.    January 10, 1991.]

CLIFFORD W. DAVIDSON, ET AL, *Appellants,* v. THE STATE OF WASHINGTON, ET AL, *Respondents.*

14

*David Joseph Smith* (of *Livengood, Silvernale, Carter & Tjossem*), for appellants.

*Kenneth O. Eikenberry, Attorney General,* and *Jay D. Geck* and *Mark S. Green, Assistants,* for respondents.

DOLLIVER, J.—Plaintiffs Clifford, Dorothy, and Edwin Davidson seek direct review of the trial court's decision rejecting their challenge to the location of the inner harbor line defining the waterward boundary of their shorelands. Plaintiffs assert the inner harbor line was improperly drawn in 1913 so as to deprive them of access to navigable water. Defendant State of Washington cross–appeals the trial court's declaration of a navigational easement across the State–owned harbor area in favor of plaintiffs. We hold for the State.

Plaintiffs own and operate a marina in the Kenmore area of Lake Washington. When plaintiffs purchased their property in 1961, they believed they were purchasing all of the uplands (dry land bordering the lake) and abutting shorelands (submerged land out to the State–owned harbor area) encompassing the marina improvements. However, in the mid–1960's, the Port of Seattle informed plaintiffs their docks extended beyond the inner harbor line into the State–owned harbor area and that consequently a lease from the State was required. Plaintiffs challenged the location of the inner harbor line and refused to enter a lease. In 1982, the Port of Seattle announced its intention to lease the disputed harbor area to the neighboring marina. In February 1983, plaintiffs commenced this quiet title action.

In the Washington State Constitution, adopted in 1889, the State claimed ownership over all submerged lands in navigable waters up to and including the line of ordinary high water. Const. art. 17, § 1. The declaration of State ownership divested upland owners of all riparian rights, including the right of access to deep water. *Eisenbach v. Hatfield*, 2 Wash. 236, 26 P. 539 (1891). The constitution did not, however, prohibit the State from subsequently selling such submerged lands and rights. The first Legislature authorized the sale of tideland and shoreland and provided a purchase preference to the abutting upland owners. Laws of 1889–90, ch. 14, p. 431.

Under the constitutional scheme, three distinct zones were to be created in navigable waters. Article 15 directed the Legislature to appoint a Harbor Line Commission which would, at its discretion, establish two harbor lines in navigable waters. The Commission was empowered to establish an "outer harbor line" beyond which the State would be forever prohibited from granting private rights. Within the outer harbor line the Commission was to designate an "inner harbor line". The area between these two lines was designated as the "harbor area" and was originally required to be between 50 and 600 feet in width. Ownership of the harbor area was also reserved for the State and "forever reserved for landings, wharves, streets, and other conveniences of navigation and commerce." Const. art. 15, § 1. Although prohibited from permanently granting rights in the harbor area, the State was empowered to lease the harbor area to private persons for periods up to 30 years. Finally, the area inside the inner harbor line was designated as either shorelands (water not subject to tidal flow) or tidelands (water subject to tidal flow) and was the area subject to sale to private parties. Shorelands and tidelands are designated as first or second class with first class properties originally being those located within the corporate limits of any city or 1 mile thereof. *See* Const. arts. 15, 17; RCW 79.90.030–.050; RCW 79.90.090; Johnson & Cooney, *Harbor Lines and the Public Trust Doctrine in*

*Washington Navigable Waters,* 54 Wash. L. Rev. 275, 290 (1979).

In 1905, the State sold the shorelands here in question to plaintiffs' remote predecessor in interest. The deed described the conveyed property simply as "[a]ll shore lands of the second class . . . in front of, [or] adjacent to" lots 1 and 2 of section 11. As with most second class shorelands sold during that time, the deed left the waterward boundary of the shorelands undefined.

In 1911, construction began on a set of locks (the Chittenden Locks) and a canal to connect Puget Sound to Lake Washington. As a result, the water level in Lake Washington was to be lowered approximately 8 feet. Before the lake was lowered, the State brought suit to determine ownership of the new shorelands to be created. *State v. Sturtevant,* 76 Wash. 158, 135 P. 1035 (1913). After trial, but before the appeal was decided by the Supreme Court, the Legislature passed a statute establishing the waterward boundary for previously sold second class shorelands in Lake Washington at the line of navigability "as the same shall be found in such waters after such lowering". However, the act was expressly inapplicable to portions of second class shorelands subsequently selected by the Commissioner of Public Lands for harbor areas, docks, wharves, or other public purposes. Laws of 1913, ch. 183, § 1, p. 667.

The 1913 statute directed the Commissioner of Public Lands to survey Lake Washington and designate suitable areas for harbor areas, slips, wharves, warehouses, and other public purposes. Laws of 1913, ch. 183, § 2, p. 668. In 1914, the Harbor Line Commission approved the harbor areas and harbor lines selected by the Commissioner. The 1914 plat established only a "pier head line" in front of plaintiffs' property. However, the 1914 plat was immediately challenged, and this court voided all reservations within previously sold shorelands as an impermissible intrusion into the owners' fee simple title and voided all pierhead lines as being without authority. *Puget Mill Co. v.*

*State,* 93 Wash. 128, 160 P. 310 (1916). *See also Puget Mill Co. v. State, supra* at 141–42 (Chadwick, J., concurring).

The Legislature responded in 1917 by directing the Commissioner of Public Lands to prepare two new plats of Lake Washington. The first plat was to establish harbor lines in front of such previously sold second class shore-lands as deemed necessary for the use of the public as harbor areas. Laws of 1917, ch. 150, § 1, p. 612. The harbor lines in question here were established pursuant to section 1 of the 1917 statute and adopted by the Public Lands Commission in 1921.

Kenmore is located at the extreme northeast end of Lake Washington on a generally shallow portion of the lake. Plaintiffs' property is located adjacent to the mouth of the Sammamish River. The inner harbor line segment bordering this section of the lake ranges from a depth of 10 feet at its western edge and 6 feet at its eastern edge to a minimum of 2½ feet near a bulge in the shoreline. Where the line fronts plaintiffs' property, the depth ranges from approximately 4 to 6 feet. As drawn, the harbor lines help preserve access to the mouth of the Sammamish River.

Following initiation of this quiet title action, both parties sought partial summary judgment. The State's motion was granted. The court held plaintiffs' predecessor in interest took subject to the power of the State to set harbor lines in front of their shorelands. The court further held that the State is not required to establish the inner harbor line coincident with the line of navigability, and the standard of review for Harbor Line Commission action is arbitrary or fraudulent. At trial, the court determined that the Harbor Line Commission had not acted arbitrarily or fraudulently in establishing the inner harbor line. The trial court further held that plaintiffs' challenge was barred by the doctrine of laches. Finally, the trial court declared a navigational easement benefiting plaintiffs for access to deep water across the State–owned harbor area. This appeal followed.

The primary issue before us is whether the Harbor Line Commission was required to establish the inner harbor line coincident with an objectively defined line of navigability. Plaintiffs characterize the case as one of contractual intent. They contend the overwhelming evidence shows the parties intended the shorelands' waterward boundary to be the line of navigability, which would be determined objectively based on the depth practicably necessary to reach deep water. The State responds by arguing the controlling legislative intent was to convey shorelands with a presently undefined boundary subject to the State's power subsequently to establish an inner harbor line as the boundary.

Plaintiffs' interpretation of contractual intent relies primarily on excerpts from this court's decision in *State v. Sturtevant,* 76 Wash. 158, 135 P. 1035 (1913). In quieting title to shorelands created by the lowering of Lake Washington, the court found "[t]he value of shore lands in most instances lies in the fact that ownership gives access to deep or navigable water. The state has sold, and the purchaser has bought, believing this to be true." *Sturtevant,* 76 Wash. at 165. Accordingly, the court confirmed the existing shoreland owners' title to the uncovered shorelands as well as their right to improve and build docks up to the line of navigation as it would exist in the lowered lake. Although the court recognized shorelands were subject, under the 1913 statute, to the right of the State to establish a harbor line fixing the waterward boundary, the court viewed the shoreland owners' rights as remaining relatively unaffected. The court explained,

> Now, theoretically, that [boundary] line is already fixed. It is the line of navigability. Although not surveyed and put on paper, the officers of the state are presumed to find that line and define it when establishing the inner harbor line.

*Sturtevant,* 76 Wash. at 166. Plaintiffs interpret the court's language in *Sturtevant* to establish a mutual intent recognizing an objectively determinable waterward boundary providing access to deep water.

■ Unfortunately, plaintiffs' interpretation of contractual intent relies on only a few isolated excerpts from the *Sturtevant* opinion. It fails to take into account the *Sturtevant* opinion as a whole, subsequent cases, and the statutes. Furthermore, ordinary rules of contract interpretation do not apply here. Where a deed or grant from the State fails to define or limit the boundary of the grant, the boundary will be interpreted most strongly against the grantee rather than the grantor state. *Pearl Oyster Co. v. Heuston,* 57 Wash. 533, 538, 107 P. 349 (1910).

Article 17, section 1 undeniably "destroyed all riparian right in tide and shore lands, and affirmed the right of the state to absolutely control and dispose of these lands in any way . . . the legislature might ordain." *Sturtevant,* 76 Wash. at 163. The State acquired complete discretion to declare what portions of navigable lake beds would constitute shorelands and be subject to sale to private parties. *Sturtevant,* 76 Wash. at 167.

■ Pursuant to this broad power, the Legislature elected to sell second class shorelands, including those in question here, without a definite waterward boundary. This approach allowed the State to fix the waterward boundary at a later date by establishing an inner harbor line. This court has consistently recognized the State's undeniable power to establish definite boundaries to second class shorelands by setting the inner harbor line. *Sturtevant,* 76 Wash. at 166; *Puget Mill,* 93 Wash. at 136. The Legislature expressly reserved this right in the 1913 statute extending shorelands to the line of navigation in the lowered lake. Laws of 1913, ch. 183, § 1, p. 667.

Plaintiffs do not challenge the authority of the State to establish harbor lines, but rather argue the line must coincide with an objectively fixed line of navigation. On rehearing, the *Sturtevant* court clarified its earlier ruling to make clear that the harbor line need not always coincide with an objective line of navigability. The court held:

Inasmuch as this court has held that harbor lines do not necessarily have to be laid in deep water; and the further fact that harbor lines cannot always be made to follow the sinuosities of the line of navigability, as that term is defined at common law, that the inner harbor line may at times be in deep water and at other times in shallow water, but wherever fixed, that which is within it is land, and that without it is water . . ..

(Citation omitted.) *Sturtevant,* 76 Wash. at 178–79. The court clarified its holding in order to avoid the literalist interpretation urged by plaintiffs. The waterward boundary to second class shorelands did not exist on the ground until the State established the inner harbor line. In fact, the original *Sturtevant* opinion makes clear the court did not conceive of the ordinary line of navigation as an objectively fixed line. The court believed it was the placement of the inner harbor line which fixed the line of navigability, not vice versa. *Sturtevant,* 76 Wash. at 173 ("the line of navigability as it may be finally fixed by or through or in consequence of the act of its grantor, the state"). Once the harbor line was established, "the water boundary theretofore open would be forever settled." *Sturtevant,* 76 Wash. at 168.

The establishment of harbor lines was again considered in *Puget Mill Co. v. State, supra,* where the court held that shoreland owners hold title inside the harbor line in fee simple absolute. *Puget Mill,* 93 Wash. at 134–35. The court, however, expressly distinguished the question of absolute title from establishment of the boundary to that title. Definition of the outer boundary was to be accomplished solely by establishment of harbor lines by the proper state authority. The court expressly held the State's broad discretion to limit the shoreland subject to sale by establishing harbor lines in unsold shorelands in advance of the sale was equally applicable to previously sold shorelands. *Puget Mill,* 93 Wash. at 135–36. Therefore, the State was not bound by any preexisting objective boundary in setting the inner harbor line.

Our most recent consideration of the proper shoreland boundaries on Lake Washington involved competing private shoreland interests within a narrow bay. *Grill v. Meydenbauer Bay Yacht Club,* 61 Wn.2d 432, 378 P.2d 423 (1963). In setting that boundary in shallow water, we rejected a "standardized" harbor line formula as leading to unconscionable results. *Grill,* 61 Wn.2d at 436. The court stated:

> [P]hysical characteristics of the bays, coves, and inlets present so many peculiarities that a formula which works well in one situation may be inequitable in another. It is not a matter of applying a particular formula and letting the chips fall where they may.

*Grill,* 61 Wn.2d at 437–38. The harbor line adjacent to plaintiffs' property here must deal with several such "peculiarities". Plaintiffs' shorelands are in a generally shallow portion of the lake, near the mouth of the Sammamish River, and adjacent to a significant bulge in the shoreline.

This court's flexible approach in *Sturtevant, Puget Mill,* and *Grill* and our outright rejection of a standardized formula establishes that the Harbor Line Commission is not bound by a neatly defined definition of an objective line of navigability. Pursuant to the State's complete discretion to determine the extent of shorelands subject to sale to private parties, second class shorelands were sold with the waterward boundary undefined, but subject to the power and discretion of the State to subsequently fix that boundary by establishing the inner harbor line.

While the inner harbor line need not coincide with some objectively defined line of navigability, however, the State's discretion in establishing harbor lines in previously sold shorelands is not absolute. In *Puget Mill,* the possibility of judicial review for abuse of discretion was expressly left open. The court held:

> What the remedy of the owner of the shore lands might be in case of the establishment of harbor areas in front of such shore lands in arbitrary and fraudulent disregard of the line of navigability is not involved in this controversy. We do not want to

be understood as holding that there would be no remedy in such a case.

*Puget Mill,* 93 Wash. at 136–37. We now expressly adopt the standard which prohibits the State from establishing the inner harbor line in previously sold shorelands in arbitrary and fraudulent disregard of the line of navigability.

While not absolutely controlling, access to deep or navigable water was an integral part of the original grant of shorelands.

> The value of shore lands in most instances lies in the fact that ownership gives access to deep or navigable water. The state has sold, and the purchaser has bought, believing this to be true.

*Sturtevant,* 76 Wash. at 165. The thrust of our holdings, cited above, is that the line of navigability is only one factor, albeit an important one, to be considered by the Harbor Line Commission in setting harbor lines. The arbitrary and fraudulent disregard for the line of navigability standard establishes a harmonious balance between the Commission's discretion established in *Sturtevant, Puget Mill,* and *Grill* to deviate from the line of navigability in order to compensate for geographic peculiarities and the legislative purpose in granting second class shorelands to provide access to navigable water as recognized in *Grill,* 61 Wn.2d at 435, and *Sturtevant,* 76 Wash. at 165. By specifically adopting the line of navigability as a reference point, this standard of review overcomes plaintiffs' objections that the asserted State power to establish harbor lines is without limit and authorizes the State to totally divest shoreland owners of their property.

▮ Despite plaintiffs' arguments, we cannot say the Harbor Line Commission abused its discretion and established the inner harbor line fronting plaintiffs' shorelands in arbitrary and fraudulent disregard of the line of navigability. The placement of harbor lines is a discretionary act committed to the Harbor Line Commission; the challenging party has the burden of showing an abuse of discretion by

clear and convincing evidence. *Schuh v. Department of Ecology,* 100 Wn.2d 180, 186, 667 P.2d 64 (1983).

Plaintiffs' challenge to the arbitrariness of the inner harbor line relies primarily on the *Puget Mill* and *Grill* testimony of Chief Engineer Edward C. Dohm and General H.M. Chittenden, who both testified the line of navigation in Lake Washington was 18 feet. Dohm further testified in *Grill*:

> In a few instances in Lake Washington where the inner harbor line was established in shallow water for an extended distance, such as appears in the Kenmore Section and Mercer Slough Section, I consider said line was subject to correction and relocation in waters of greater depth by the owners of said shorelands if they desired to do so . . ..

We are unconvinced this testimony establishes an arbitrary and fraudulent disregard for the line of navigability. In fact, the placement of these lines appears to correspond to the variety of geographic peculiarities and administrative efficiencies emphasized by this court in both *Sturtevant* and *Grill*. The Kenmore section is located in the shallow and narrow north end of Lake Washington. Plaintiffs' shorelands are flanked to the south by a bulge in the shoreline and to the north by the mouth of the Sammamish River. In *Grill,* we dealt with a similar narrow, shallow cove. In that case, this court expressly found "physical characteristics of the bays, coves, and inlets present so many peculiarities that a formula which works well in one situation may be inequitable in another." *Grill,* 61 Wn.2d at 437. We refused to adopt an inner harbor line tied to a specified depth and instead adopted a much shallower boundary which best afforded all shoreland owners fair access to the navigable channel. *Grill,* 61 Wn.2d at 438. The inner harbor line here appears to represent a similarly reasonable accommodation of geographic peculiarities. In *Sturtevant,* we recognized the efficiency of fixing straight harbor lines may lead to lines which sometimes rest in shallow waters and other times in deep waters. *Sturtevant,* 76 Wash. at 179. The shallowness of plaintiffs' shorelands is

in part due to a significant bulge in the shoreline. Furthermore, Dohm was only the engineer, not the authority charged with adoption of the lines, and his testimony is inconsistent with evidence demonstrating that, of the 36 harbor line segments established in the 1921 plat, 19 went below 8 feet.

Finally, plaintiffs' allegation of arbitrary and fraudulent disregard of the line of navigability is barred by the doctrine of laches. The trial court found the doctrine of laches to bar both substantive and procedural review of the 1921 administrative actions of the Harbor Line Commission. We find it necessary to address only the applicability of the laches doctrine to plaintiffs' procedural challenges.

█ Laches is an equitable defense based on estoppel. A defendant asserting the doctrine of laches must affirmatively establish: (1) knowledge by plaintiff of facts constituting a cause of action or a reasonable opportunity to discover such facts; (2) unreasonable delay by plaintiff in commencing an action; and (3) damage to defendant resulting from the delay in bringing the action. *Hayden v. Port Townsend,* 93 Wn.2d 870, 874–75, 613 P.2d 1164 (1980).

Plaintiffs argue the State's action in drawing and adopting the 1921 harbor lines was not a sufficiently overt invasion of their rights to initiate a delay for purposes of laches. Plaintiffs rely on *Snively v. State,* 167 Wash. 385, 9 P.2d 773 (1932). *Snively* involved a successful action by owners of property bordering Angle Lake to declare the lake nonnavigable and thereby invalidate the State's article 17 claim to the beds of the lake. The State responded by asserting title to the lake bed by adverse possession by virtue of the fact shorelands around the lake had been sold and thereby State title asserted in the beds. The court rejected the State's claim, holding "[m]ere declarations are not sufficient. The mere intent to hold adversely is of no consequence." *Snively,* 167 Wash. at 390–91. Plaintiffs' reliance on *Snively* is misplaced. *Snively* dealt expressly with a

claim for adverse possession which requires actual possession as an element. This court found the sale of shorelands to be an insufficient act to establish actual possession over the lake bed. *Snively* did not relate to the validity of harbor lines, boundaries to shorelands, or harbor areas.

■ We have expressly recognized the duty of property owners to take notice of public laws affecting the control or disposition of their property. *Martin v. Seattle,* 111 Wn.2d 727, 735, 765 P.2d 257 (1988). In *Martin,* the plaintiffs held a right of reentry to shorelands previously quitclaimed to the City of Seattle. The 1913 shoreland statute breached that right of reentry by placing use restrictions on the uncovered shorelands deeded to the City under the statute. When plaintiffs finally sought to exercise their right of reentry in 1983, this court held the right had expired.

> [T]he 1913 breach was or should have been apparent to the grantor because the newly uncovered shorelands were given by the State to the City by public law. . . .
>     All persons are charged with knowledge of the provisions of statutes and must take notice thereof.

*Martin,* 111 Wn.2d at 735 (quoting 58 Am. Jur. 2d *Notice* § 21 (1971)). Here, that same 1913 statute plainly established the State's power to draw harbor lines in front of previously sold shorelands. Similarly, the 1921 plat establishing the inner harbor line in question was adopted as public law by the Public Lands Commission after extensive public hearings. Plaintiffs and their predecessors had a more than adequate basis to know their asserted rights had been invaded and therefore should be compelled to act.

■ Plaintiffs also argue the State failed to meet its burden of proof as to material prejudice from the delay. The doctrine of laches commonly recognizes the unavoidable loss of defense evidence as establishing material prejudice. *Hinchman v. Kelley,* 54 F. 63 (9th Cir. 1893); *Anderson v. Anderson,* 59 Hawaii 575, 590, 585 P.2d 938 (1978). The 62–year delay in challenging the 1921 harbor lines deprived the State of substantial evidence. All those who surveyed, drew, and established the harbor area are now deceased. Expert

witnesses for both sides were unable to discover any first-hand documents setting forth the basis for the placement of the lines. The best remaining evidence relative to the establishment of the harbor lines in Kenmore is past deposition and trial testimony of Chief Engineer Dohm taken in the course of *Puget Mill Co. v. State,* 93 Wash. 128, 160 P. 310 (1916) and *Grill v. Meydenbauer Bay Yacht Club,* 61 Wn.2d 432, 378 P.2d 423 (1963). However, neither *Puget Mill* nor *Grill* involved the validity or arbitrariness of the harbor lines themselves, the State was denied the opportunity to cross–examine Dohm on those issues, and Dohm's testimony is marked by internal inconsistencies on key points. Accordingly, we find the State's ability to defend against this cause of action to have been significantly prejudiced by the lapse of more than 60 years. Therefore, we find the doctrine of laches to bar plaintiffs' claim that the inner harbor line bordering their shorelands was drawn in arbitrary and fraudulent disregard of the line of navigability.

Plaintiffs raise two additional procedural challenges which are also barred by the laches doctrine.

Plaintiffs challenge the validity of the 1921 harbor lines for procedural compliance with the statute of 1917. Plaintiffs contend the Commissioner of Public Lands failed adequately to distinguish between sold and unsold shorelands in compiling the two required plats. The record before us indicates the Commissioner compiled two plats of Lake Washington shorelands which differed only in that the second plat marked the unsold shorelands with ink. Arguably, this approach failed to satisfy the strict letter of the statute. However, the plats substantially complied with the statutory requirements, and those who actually drafted the plats are no longer available to verify whether the process met the statutory purposes. Furthermore, any procedural imperfections could have been easily perfected in 1921 by the same people who drew the original plats. To redraw the plats at this late date would involve substantial effort and

would prejudice the State and the numerous Lake Washington shoreland owners who have acted in reliance on the plat since 1921. Therefore, plaintiffs' claim is barred by laches.

Plaintiffs also argue the harbor lines should be voided because plaintiffs' remote predecessors in interest received no contested case hearing when the lines were adopted and therefore were denied due process. Even if a contested case hearing was clearly required in this case, the evidence at trial showed Dohm held public informational meetings throughout the area, took votes, heard comments, and even changed the plat in response to comments. Unfortunately, much of the evidence which might reveal whether or not these meetings satisfied the contested case hearing requirement has been lost through the years. Accordingly, the State's ability to defend this challenge has been prejudiced by plaintiffs' delay and application of the laches doctrine is appropriate.

Plaintiffs also allege the trial court committed reversible error in striking plaintiffs' jury demand. Plaintiffs rely on RCW 4.40.060, which provides that issues of fact in an action for recovery of specific real property shall be tried by a jury, and RCW 7.28.140, which provides for a special jury verdict in an ejectment action.

■ We find both of plaintiffs' claims to be without merit. RCW 4.40.060 plainly ties the right to a jury trial to the presence of issues of fact. However, plaintiffs' argument fails to identify a single issue of fact which could be tried to a jury. Furthermore, plaintiffs' action is not properly characterized as either a quiet title or ejectment action. This court has held the establishment of shoreland boundaries to be the exclusive dominion of the Harbor Line Commission. *Grill*, 61 Wn.2d at 438. Therefore, if successful, plaintiffs are limited to a ruling invalidating the existing harbor line and may not recover title to a specific line. The trial court did not abuse its discretion in denying plaintiffs' jury demand.

Plaintiffs finally argue the trial court's refusal to hear the testimony of John DeMeyer constitutes reversible error. DeMeyer is the head of the aquatic lands division for the Department of Natural Resources (DNR). DeMeyer would have allegedly testified that in placing the harbor line around Mercer Island in 1980, DNR believed the inner harbor line was unascertainable without the line of navigability and the line of navigability was a question of fact.

The exclusion of oral testimony constitutes reversible error only if, by giving the excluded testimony the construction most favorable to the appellant, it can be reasonably said the testimony's admission may have changed the outcome of the case. *In re Estate of Ward,* 159 Wash. 252, 257, 292 P. 737 (1930). While DeMeyer's testimony was excluded, the court did admit testimony related to recent DNR harbor line policies from two other witnesses. DeMeyer's immediate predecessor, William Johnson, testified extensively as to the formulation of DNR's proposed harbor lines for Diamond Lake. Similarly, Harold Hartinger, an assistant attorney general from 1957 to 1968, testified as to his role in shaping DNR policy with respect to harbor lines. Therefore, the court was presented with substantial evidence as to DNR policies. DNR policy in the 1950's, 1960's, and 1970's is only remotely relevant to the validity of the Harbor Line Commission policy in 1921. In its oral opinion, the trial court expressly found that DNR policy has not been consistent in theory or application during the various administrations. Given the admission of relatively comparable evidence and the remoteness of the evidence from the 1921 Harbor Line Commission action, admission of DeMeyer's testimony would be unlikely to affect the outcome. Therefore, exclusion of the testimony does not constitute reversible error.

The State cross–appeals the trial court's declaration of a navigational easement benefiting plaintiffs for access to deep water across the State–owned harbor area. The trial court entered conclusion of law 17 providing:

Plaintiffs have a navigational easement across the harbor area for reasonable access to deep water by virtue of their shoreland purchase. The State may not by leasing the harbor area in front of plaintiffs' shorelands deprive plaintiffs of such reasonable access to deep water.

The question of a navigational easement was neither briefed nor argued before the trial court and is unprecedented in this state's case law. Furthermore, the actual impact of a harbor area lease to plaintiffs' neighbors, and in fact the lease itself, is entirely speculative at this time. Accordingly, the question of a navigational easement to protect plaintiffs' access to deep water is not ripe for judicial resolution at this time. *Thayer v. Thompson,* 36 Wn. App. 794, 797, 677 P.2d 787 (1984). Therefore, we vacate the trial court's declaration of a navigational easement and reserve final consideration of the issue for another day.

We affirm the trial court's resolution of the harbor line, jury demand, and evidentiary issues and vacate the trial court's declaration of a navigational easement.

CALLOW, C.J., UTTER, BRACHTENBACH, ANDERSEN, SMITH, and GUY, JJ., and CUNNINGHAM and WIELAND, JJ. Pro Tem., concur.